The FOUNDING CHURCH OF SCIEN-
TOLOGY OF WASHINGTON, D. C.,
INC., Appellant,

v.

NATIONAL SECURITY AGENCY et al.

No. 77–1975.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 27, 1978.
Decided May 15, 1979.

William A. Dobrovir, Washington, D. C.,
for appellant.

Michael F. Hertz, Atty., Dept. of Justice,
Washington, D. C., with whom Earl J. Sil-
bert, U. S. Atty., Barbara Allen Babcock,
Asst. Atty. Gen., and Robert E. Kopp, Atty.,
Dept. of Justice, Washington, D. C., were
on the brief, for appellee. Leonard Schait-
man, Atty., Dept. of Justice, Washington,
D. C., also entered an appearance for appel-
lee.

Before TAMM and ROBINSON, Circuit Judges, and OBERDORFER,[*] United States District Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by SPOTTS-WOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

The Founding Church of Scientology of Washington, D.C., Inc., the appellant, complained in the District Court of the refusal of the National Security Agency (NSA), the appellee, to release documents requested by appellant under the Freedom of Information Act.[1] The court, relying upon an affidavit submitted by the agency, ruled that the materials solicited were protected from disclosure by joint operation of Exemption 3 of the Act[2] and Section 6 of Public Law No. 86–36,[3] and granted summary judgment in favor of NSA.[4] We find that NSA failed to establish its entitlement to a summary disposition of the litigation. Accordingly, we reverse the judgment appealed from and remand the case for additional proceedings before the District Court.

## I

NSA was created by order of the President in 1952[5] and endowed with a twofold mission. Its first major task is shielding the Nation's coded communications from interception by foreign governments. Its second principal function, implicated by appellant's document request, entails acquisition of information from electromagnetic signals and distillation of that information for assimilation by the intelligence community and national policymakers. As a part of the latter activity, NSA surreptitiously intercepts international communications by a variety of means.

In December, 1974, appellant sought access, pursuant to the Freedom of Information Act, to all records maintained by the Agency on appellant and the philosophy it espouses, as well as records reflecting dissemination of information about appellant to domestic agencies or foreign governments. Subsequently, appellant's request was enlarged to embrace all references touching on L. Ron Hubbard, founder of the doctrine of Scientology. NSA's reply was that it had not established any file pertaining either to appellant or Hubbard, and that it had transmitted no information regarding either to the entities specified in the demand. In March, 1975, appellant enumerated other Scientology organizations with respect to which pertinent records might exist. NSA again denied possession of any of the data sought.

In the course of Freedom of Information Act proceedings against the Department of State and the Central Intelligence Agency (CIA), appellant learned that NSA had at least sixteen documents concerning Scientology, appellant and related organizations. So advised, and armed with details solicited from CIA, NSA succeeded in locating fifteen of those items in warehouse storage, and obtained a copy of the sixteenth from CIA. Release of these materials was resisted, however, on grounds that they were protected from disclosure by provisos of the

---

[*] Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. Pub.L.No.89–487, 80 Stat. 251 (1966), codified by Pub.L.No.90–23, 81 Stat. 55 (1967), as amended by Government in the Sunshine Act, Pub.L.No.94–409, § 5(b)(3), 90 Stat. 1247 (1976), codified at 5 U.S.C. § 552 (1976) (hereinafter cited as codified).

2. 5 U.S.C. § 552(b)(3) (1976).

3. Pub.L.No.86–36, § 6, 73 Stat. 63 (1959), codified at 50 U.S.C. § 402 note (1976), quoted in text *infra* at note 25.

4. *Founding Church of Scientology v. NSA*, 434 F.Supp. 632 (D.D.C.1977).

5. Memorandum from President Harry S. Truman to the Secretary of State and the Secretary of Defense, "Communications Intelligence Activities" (Oct. 24, 1952). See S.Rep.No.755, 94th Cong., 2d Sess. 736 (1976). NSA is a separately organized agency within the Department of Defense, and is controlled by the Secretary of Defense.

Act relating to national security matters[6] and to confidentiality specifically imparted by other statutes.[7]

In August, 1976, appellant commenced suit in the District Court to compel NSA to conduct a renewed search of its files and to enjoin any withholding of the materials desired. Appellant served numerous interrogatories on NSA inquiring into its efforts to locate responsive records, its classification of documents, and its correspondence with CIA with respect to the items theretofore uncovered. Purportedly to avoid revelation of functions and activities assertedly insulated by the Act from public scrutiny,[8] NSA declined to supply more than minimal information in answer to the interrogatories.

Then, invoking Public Law No. 86–36[9] and Exemption 3[10] exclusively, NSA moved for dismissal of the action or alternatively for summary judgment in its favor. In support of the motion, NSA tendered the affidavit of Norman Boardman, its information officer, and offered to furnish a more detailed but classified affidavit for *in camera* inspection. Appellant vigorously opposed any *ex parte* submission and sought more extensive public airing of the issues. The District Court was of the view that Section 6 of Public Law No. 86–36 was an Exemption 3 statute foreclosing compulsory release of the sought-after data.[11] In that light, and on the basis of Boardman's public affidavit, the court ordered summary judg-

ment for NSA.[12] From that action, this appeal was taken.

## II

Appellant begins with a challenge to the District Court's holding that the sixteen documents admittedly retained by NSA enjoy a protected status.[13] Appellant then complains of the court's failure to probe more thoroughly NSA's protestations respecting possession of other relevant material.[14] In pressing the first point, appellant concedes that Section 6 of Public Law No. 86–36 is a law bringing Exemption 3 into play but claims inadequacies in the agency's showing, upon which the District Court awarded summary judgment. More particularly, appellant contends that the Boardman affidavit lacked sufficient detail to enable an informed determination as to whether disclosure of any or all of the sixteen items would illuminate agency activities of which the public was not already aware. We, too, believe that Section 6 is an Exemption 3 statute and that NSA's affidavit did not furnish a satisfactory basis for testing the exemption's applicability to the data appellant seeks.

## A

As originally enacted, Exemption 3 authorized the withholding of information "specifically exempted from disclosure by statute."[15] The exemption was amended in

---

**6.** Exemption 1, 5 U.S.C. § 553(b)(1) (1976), immunizes from compulsory disclosure information that is

(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order[.]

As the District Court did not predicate the summary judgment on this exemption, we do not consider its applicability here. See text *infra* at notes 9–10.

**7.** Exemption 3, 5 U.S.C. § 552(b)(3) (1976), quoted in text *infra* at note 19.

**8.** See notes 6–7 *supra*.

**9.** Quoted in text *infra* at note 25. Initially, NSA also advanced 18 U.S.C. § 798 (1976) and 50 U.S.C. § 403(d)(3) (1976) as Exemption 3

statutes. For a discussion of these provisions in the context of litigation against NSA, see *Baez v. NSA*, 76–1921 (D.D.C. April 7, 1978). NSA's summary judgment motion and the District Court's decision, however, rested only on Pub.L.No.86–36. We limit our consideration accordingly.

**10.** Quoted in text *infra* at p. note 19.

**11.** *Founding Church of Scientology v. NSA*, *supra* note 4, 434 F.Supp. at 633.

**12.** *Id.*

**13.** See text *supra* at note 6.

**14.** Discussed in Part III *infra*.

**15.** 5 U.S.C. § 552(b)(3) (1976).

1976, however, "to overrule [a] decision of the Supreme Court" [16] which had sanctioned rejection of a records request on grounds that nondivulgence was authorized by a statute conferring a "broad degree of discretion" [17] on an agency to conceal data "in the interest of the public." [18] Under the exemption as amended, materials are deemed "specifically exempted from disclosure by statute" only if the "statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." [19] Subsection (A) reaches only those laws that mandate confidentiality "absolute[ly] and without exception"; [20] it condones no decisionmaking at the agency level. [21] Subsection (B), on the other hand, does contemplate some exercise of administrative discretion in closely circumscribed situations, "but its unmistakeable thrust . . . is to assure that basic policy decisions on governmental secrecy be made by the Legislative rather than the Executive branch." [22]

The provision on which NSA relies to trigger Exemption 3 into operation is Section 6 of Public Law No. 86–36, which states that with exceptions inapplicable in this case

> nothing in this Act [23] or any other law (including, but not limited to, the [Classification Act of 1949]) [24] shall be construed to require the disclosure of the organization or any function of the National Security Agency, of any information with respect to the activities thereof, or of names, titles, salaries, or number of the persons employed by such agency.[25]

Plainly, Section 6 insulates the information specified from mandatory divulgence though it does not purport to bar voluntary disclosure by NSA itself. Since it countenances administrative discretion to publicize or maintain secrecy, Section 6 lacks the rigor demanded by Subsection (A) of Exemption 3. But appellant acknowledges, and the District Court ruled,[26] that, within the meaning of Subsection (B), Section 6 "refers to particular types of matters to be withheld." [27] More specifically, in material part the provision protects information laying open "the organization or any function of the National Security Agency, . . . [or] the activities thereof." [28]

Our examination of Section 6 and its legislative history confirms the view that it manifests a "congressional appreciation of the dangers inherent in airing particular

---

**16.** H.R.Rep.No.1441, 94th Cong., 2d Sess. 14 (1976) (conference report), referring to *Administrator v. Robertson*, 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975).

**17.** *Administrator v. Robertson, supra* note 16, 422 U.S. at 266, 95 S.Ct. at 2148, 45 L.Ed.2d at 174.

**18.** 49 U.S.C. § 1504 (1976), providing that, upon objection of any person, agency officials "shall order such information withheld from public disclosure when, in their judgment, a disclosure of such information would adversely affect the interests of such person and is not required in the interest of the public."

**19.** 5 U.S.C. § 552(b)(3) (1976).

**20.** 122 Cong.Rec. H9260 (daily ed. Aug. 31, 1976) (remarks of Representative Abzug).

**21.** *American Jewish Congress v. Kreps*, 187 U.S.App.D.C. 413, 415 & n.33, 574 F.2d 624, 626 & n.33 (1978) (discussing legislative history).

**22.** *Id.* at 417, 574 F.2d at 628 (footnote omitted).

**23.** Pub.L.No.86–36, 73 Stat. 63 (1959) ("[t]o provide certain administrative authorities for the National Security Agency"), as amended, 50 U.S.C. § 402 note (1976).

**24.** 5 U.S.C. § 654 (1958), repealed by Pub.L. No.86–626, 74 Stat. 427 (1960).

**25.** Pub.L.No.86–36, § 6, 73 Stat. 64 (1959), in 50 U.S.C. § 402 note (1976).

**26.** *Founding Church of Scientology v. NSA, supra* note 4, 434 F.Supp. at 633.

**27.** See text *supra* at note 19. Concurring in this view are *Baez v. NSA, supra* note 9; *Kruh v. GSA*, 421 F.Supp. 965, 967–968 (E.D.N.Y. 1976).

**28.** See text *supra* at note 25.

data," [29] and thus satisfies the strictures of Subsection (B). The section was enacted at the request of the Department of Defense.[30] The Department's immediate aim was termination of personnel oversight by the Civil Service Commission, which would subject highly sensitive agency activities to inspection.[31] Exclusion from the Classification Act,[32] administered by the Civil Service Commission, was thought to be "consistent with the treatment . . . accorded other agencies engaged in specialized or highly classified defense activities." [33] The purpose and scope of the bill proposed was broader, however, for, as the Department explained, "[t]he unique and highly sensitive activities of the Agency require extreme security measures." [34] Accordingly, the bill incorporated provisions "exempting the Agency from statutory requirements involving disclosures of organizational . . matters which should be protected in the interest of national defense." [35]

The Senate report focused on relieving NSA from the requirements of the Classification Act.[36] But it also echoed the Department's concern over publicity of NSA's "very highly classified functions vital to the national security." [37] The statutory language similarly evinces a purpose to shield the matters enumerated from indiscriminate public consumption. Section 6 ordains unequivocally that "nothing in this Act or any other law (including, but not limited to, the [Classification Act]) shall be construed to require . . . disclosure." [38]

Thus, Section 6 embodies far more than "a vague apprehension that [the] Agency might someday fall heir to sensitive information." [39] It reflects instead a congressional judgment that, in order to preserve national security, information elucidating the subjects specified ought to be safe from forced exposure. The basic policy choice was made by Congress, not entrusted to administrative discretion in the first instance. It follows that Section 6 is a statute qualifying under Exemption 3.[40]

Even the most casual reading of Section 6 suggests, however, a potential for unduly broad construction. On the one hand, the section embraces personnel matters of a fairly restricted character and susceptible of little interpretation.[41] Literal application of those terms might expectably honor the congressional policy underlying Section 6 without doing violence to the Freedom of Information Act's "overwhelming emphasis upon disclosure." [42] On the other hand,

**29.** *American Jewish Congress v. Kreps, supra* note 21, 187 U.S.App.D.C. at 417, 574 F.2d at 628.

**30.** Letter from Donald A. Quarles, Acting Secretary of Defense, to Richard M. Nixon, President of the Senate (Jan. 2, 1959), included in S.Rep.No.284, 86th Cong., 1st Sess. 2–3 (1959).

**31.** *Id.* at 3 (letter).

**32.** See note 24 *supra*.

**33.** S.Rep.No.284, *supra* note 30, at 3 (letter); see *id.* at 2 (text of report).

**34.** *Id.* at 3 (letter).

**35.** *Id.* (letter).

**36.** *Id.* at 1–2 (text of report).

**37.** *Id.* at 1 (text of report).

**38.** See text *supra* at note 25.

**39.** *American Jewish Congress v. Kreps, supra* note 21, 187 U.S.App.D.C. at 417, 574 F.2d at 628.

**40.** Accord, *Baez v. NSA, supra* note 9; *Kruh v. GSA, supra* note 27, 421 F.Supp. at 967–968.

**41.** "[N]ames, titles, salaries, or number of the persons employed by [the] agency." See text *supra* at note 25.

**42.** *Vaughn v. Rosen,* 157 U.S.App.D.C. 340, 343, 484 F.2d 820, 823 (1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). Compare *Baker v. CIA,* 188 U.S.App.D.C. 401, 580 F.2d 664 (1978), in which we construed literally § 7 of the Central Intelligence Agency Act of 1949, ch. 227, § 7, 63 Stat. 211 (1949), codified at 50 U.S.C. § 403g (1970), which exempted "from the provisions of section 654 of Title 5, and the provisions of any other law which requires the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency . . . ." We noted, however, that to require that sought-after personnel material be in fact linked with intelligence, security, sources or methods would render § 403g "mere surplusage, since such a showing would necessarily bring the requested

Section 6 encompasses "any information with respect to the *activities*" of NSA,[43] and that implicates superficially the gamut of agency affairs. To be sure, the legislation's scope must be broad in light of the agency's highly delicate mission. But a term so elastic as "activities" should be construed with sensitivity to the "hazard[s] that Congress foresaw."[44] As we have observed in an analogous context, "[t]o fulfill Congress' intent to close the loophole created in *Robertson*,[45] courts must be particularly careful when scrutinizing claims of exemptions based on such expansive terms."[46]

NSA has not based its repulsion of appellant's informational request upon an illusory need to safeguard "secrets" either familiar to all or unrelated to its operational modes. In the agency's words, its "claim . . . . . is not made with respect to its general functions or activities";[47] it seeks instead to halt any divulgence of "information in such detail so as to let potential adversaries know which specific communications circuits are not secure, and which communications, depending on the circuits through which they were transmitted, the Agency is likely to possess or not possess."[48] That position, if substantiated, would undercut appellant's reliance on the Senate's far-ranging disclosure of NSA's operations in the course of recent investigations of gross illegalities on the part of intelligence agencies,[49] for the Senate inquiries seemingly stopped short of revealing specifics about the agency's intelligence capabilities,[50] which still warrant stringent

information within the purview of § 403(d)(3) [see note 46 *infra*] and thereby immunize it from disclosure without the need for a separate statutory exemption." *Baker v. CIA, supra,* 188 U.S.App.D.C. at 405, 580 F.2d at 668. We observed, too, that "section 403g creates a very narrow and explicit exception *to the requirements of the*" Freedom of Information Act. *Id.* 188 U.S.App.D.C. at 407, 580 F.2d at 670.

**43.** See text *supra* at note 25.

**44.** *American Jewish Congress v. Kreps, supra* note 21, 187 U.S.App.D.C. at 418, 574 F.2d at 629.

**45.** See note 16 *supra* and accompanying text.

**46.** *Ray v. Turner,* 190 U.S.App.D.C. 290, 323, 587 F.2d 1187, 1220 (D.C.Cir. 1978) (concurring opinion). We spoke there of 50 U.S.C. § 403(d)(3) (1976), which instructs the Director of the Central Intelligence Agency to protect "intelligence sources and methods from unauthorized disclosure." We observed that, "while the 'particular types of matters' listed in Section 403g (e. g., names, official titles, salaries) are fairly specific, Section 403(d)(3)'s language of protecting 'intelligence sources and methods' is potentially quite expansive."

It may be that Congress intended to confer no greater protection to NSA's "activities" by enacting Pub.L.No.86–36 than it did to CIA by complementary operation of §§ 403g and 403(d)(3). See *Baez v. NSA, supra* note 9. The Senate Report discussing Pub.L.No.86–36 likened the secrecy afforded NSA to that allowed other intelligence agencies exempted from the Classification Act, which would include CIA.

See S.Rep.No.284, *supra* note 30, at 2 ("[s]uch exemption would be consistent with legislation in effect with respect to other agencies similarly engaged in highly classified defense activities"). As NSA's defense in the instant case is avowedly directed at safeguarding intelligence sources and methods, see text *infra* at notes 47–48, we need not consider whether the term "activities" in Pub.L.No.86–36 might conceivably shield any more than that.

**47.** Brief for Appellees at 14.

**48.** *Id.* at 13 n.5; see *id.* at 12–13.

**49.** See Final Report of the Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, S.Rep.No.755, 94th Cong., 2d Sess. (1976) (especially Book III, at 733–786). Although NSA would have no protectable interest in suppressing information simply because its release might uncloak an illegal operation, it may properly withhold records gathered illegally if divulgence would reveal currently viable information channels, albeit ones that were abused in the past. Compare *Halkin v. Helms,* 194 U.S.App.D.C. 82, 90–91, 598 F.2d 1, 9–10 (D.C.Cir. 1978). Of course, every effort should be made to segregate for ultimate disclosure aspects of the records that would not implicate legitimate intelligence operations, however embarrassing to the agency.

**50.** See S.Rep.No.755, *supra* note 49, Book III, at 735–736 ("[t]he Committee recognizes that NSA's vast *technological capability* is a sensi-

protection from compulsory exposure. With this background, then, we proceed to examine whether the District Court adequately undertook to adjudicate the applicability of Section 6 to the materials appellant seeks.

## B

■ Congress has directed that in reviewing agency rejections of Freedom of Information Act requests, "the court shall determine the matter de novo, and may examine the contents of . . . agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b)." [51] Very importantly, "the burden is on the agency to sustain its action." [52] The legislative history of the Act explains that "the Government should be given the opportunity to establish by means of testimony or *detailed* affidavit that the documents are *clearly* exempt from disclosure," [53] and that the court should "accord substantial weight to an agency's affidavit." [54] But, as in the recent past we

have noted, "conclusory and generalized allegations of exemptions" are unacceptable; [55] if the court is unable to sustain nondivulgence on the basis of affidavits, *in camera* inspection may well be in order. As Congress has declared, "in many situations" review of requested materials in chambers "will plainly be necessary and appropriate." [56]

We think the District Court failed in this litigation to conduct a true de novo review consonant with the foregoing principles, and that summary judgment was precipitously entered. The showing made by NSA consisted wholly in the public affidavit of Norman Boardman, its information officer. [57] Boardman avowed that the materials requested "were acquired in the course of conducting lawful signals intelligence activities," and that "[r]elease of any record or portion thereof would disclose information about the nature of NSA's activities including its functions." [58] He further explained:

I have determined that the records involved in this case and specific informa-

tive national asset which ought to be zealously protected for its value to our common defense" (emphasis supplied)); *id.* at 736–783. See also *Hearings Before the Select Comm. to Study Governmental Operations with Respect to Intelligence Activities,* 94th Cong., 1st Sess. 36, Vol. 5 (1975) (remarks of Senator Church, Chairman) ("[t]o make sure this Committee does not interfere with ongoing intelligence activities, we have had to be exceedingly careful for the *techniques* of the NSA are of the most sensitive and fragile character" (emphasis supplied)). Compare *Halkin v. Helms, supra* note 49, 194 U.S.App.D.C. at 90–91, 598 F.2d at 9–10.

**51.** 5 U.S.C. § 552(a)(4)(B) (1976).

**52.** *Id.*

**53.** S.Rep.No.1200, 93d Cong., 2d Sess. 9 (1974), *reprinted* in [1974] U.S.Code Cong. & Ad.News 6267, 6287 (conference report) (emphasis supplied). See *Ray v. Turner, supra* note 46, 190 U.S.App.D.C. at 303–305, 587 F.2d at 1210–1212 (concurring opinion); *Weissman v. CIA,* 184 U.S.App.D.C. 117, 121–122, 565 F.2d 692, 696–697 (1977). See also *EPA v. Mink,* 410 U.S. 73, 92–93, 93 S.Ct. 827, 838–839, 35 L.Ed.2d 119, 134–136 (1973).

**54.** S.Rep.No.1200, *supra* note 53, at 12, *reprinted in* [1974] U.S.Code Cong. & Ad.News 6290. Though these remarks were made in the context of Exemption 1, they would seem equally pertinent to Exemption 3 claims involving national security. See *Ray v. Turner, supra* note 46, 190 U.S.App.D.C. at 315, 587 F.2d at 1211; *Goland v. CIA,* 197 U.S.App.D.C. 25, 49 n. 64, 607 F.2d 339, 363 n.64 (D.C.Cir. 1978).

**55.** *Vaughn v. Rosen, supra* note 42, 157 U.S. App.D.C. at 346, 484 F.2d at 826. See *Ray v. Turner, supra* note 46, 190 U.S.App.D.C. at 321, 587 F.2d at 1218 (concurring opinion); *Goland v. CIA, supra* note 54, 197 U.S.App.D.C. at 49 n.64, 607 F.2d at 363 n.64; *Brandon v. Eckard,* 187 U.S.App.D.C. 28, 33–34, 569 F.2d 683, 688–689 (1977); *National Cable Television Ass'n v. FCC,* 156 U.S.App.D.C. 91, 98, 479 F.2d 183, 190 (1973).

**56.** S.Rep.No.1200, *supra* note 53, at 9, *reprinted in* [1974] U.S.Code Cong. & Ad.News 6287. See *Ray v. Turner, supra* note 46, 190 U.S.App. D.C. at 311, 587 F.2d at 1208 (concurring opinion).

**57.** Joint Appendix (J.App.) 83.

**58.** J.App. 89–90.

tion about those records such as numbers, dates, and type of information contained therein cannot be disclosed, because to do so would jeopardize national security functions the Agency was established to perform. . . . Disclosure of specific information which may be related to a specific individual or organization . . in the context of [the agency's] singular mission would reveal certain functions and activities of the NSA which are protected from mandatory disclosure by Section 6 of Public Law 86–36.[59]

Boardman additionally maintained that his averments were as detailed as security constraints allowed:

It is not possible to describe in a publicly filed affidavit the material in and dates of the documents held by NSA, because this would . . . enable a knowledgeable person to determine the nature of the documents . . . and thus disclose intelligence sources and methods . . . . In short, any further factual public description of material would compromise the secret nature of the information and would compromise intelligence sources and methods.[60]

In our view, the Boardman affidavit was far too conclusory to support the summary judgment awarded NSA. The agency acknowledged to the District Court, and has

represented to us on appeal, that the documents in issue have been suppressed, not on account of their "substantive content," but because release to appellant would reveal "vital national security information concerning the organization, function and communication intelligence capabilities of the NSA."[61] But the Boardman affidavit furnishes precious little that would enable a determination as to whether the materials withheld actually do bear on the agency's organization, functions or faculty for intelligence operations. Rather, it merely states, without any elucidation whatever, that compliance with appellant's demand would reveal "certain functions and activities . . . protected from mandatory disclosure by Section 6,"[62] and would "jeopardize national security functions the agency was established to perform."[63] Barren assertions that an exempting statute has been met cannot suffice to establish that fact,[64] yet one will search the Boardman affidavit in vain for anything more.

Not only does the Boardman statement fail to indicate even in the slightest *how* agency functions might be unveiled, but it also lacks so much as guarded specificity as to the "certain functions and activities"[65] that might be revealed. From aught that appears, the sixteen documents may implicate aspects of the agency's operations al-

---

**59.** J.App. 90.

**60.** J.App. 91. The affidavit also averred that "[t]he NSA is in a dilemma because it is in possession of evidence which would fully justify the withholding of the records at issue under a statute that must be cited for the protection of the records, but it cannot disclose this evidence without revealing information which itself requires the same protection." On this issue, see text *infra* at notes 73–77.

**61.** Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, at 9 n.5, Record on Appeal (docket entry 12).

**62.** See text *supra* at note 59.

**63.** See text *supra* at note 59.

**64.** See note 55 *supra* and accompanying text.

**65.** See text *supra* at note 59. In contrast, an affidavit supplied by the Central Intelligence Agency in *Goland v. CIA, supra* note 54, indicated that the substantive content of withheld information pertained to protected matters, and was sufficiently detailed to support their nondisclosure pursuant to Exemption 3:

[T]he deleted portions of the [requested document] contain detailed descriptions of (1) "intelligence collection and operational devices . . . still utilized"; (2) "methods of procurement and supply . . . unique to the Intelligence Community" which "are currently utilized"; (3) "basic concepts of intelligence methodology" of which "the essential elements remain viable"; (4) specific clandestine intelligence operations," including the "names [of] the foreign countries involved"; and (5) "certain intelligence methodologies of a friendly foreign government."

197 U.S.App.D.C. at 37, 607 F.2d at 351.

ready well publicized.[66] Suppression of information of that sort would frustrate the pressing policies of the Act without even arguably advancing countervailing considerations.[67]

Before this court, NSA has endeavored to remedy the deficiencies of its presentation in the District Court. As we have noted, the agency has identified as the subject of its concern the publication of information in such detail that its interception capabilities with respect to particular communications circuits might be exposed.[68] Were NSA able to establish its claim in that regard, immunization by Section 6 at least to that extent would be assured.[69] But the appropriate occasion for such an undertaking was during the proceedings before the District Court, in the context of de novo consideration of appellant's demand.[70]

Aside from their bearing on the substantive decision ultimately to be made, NSA's averments on appeal have significant ramifications for the conduct of the litigation. In particular, they compellingly evince the feasibility of further elaboration of the agency's public affidavit. We acknowledge, of course, that public explanations of a determination to withhold need not "contain factual descriptions that . . . would compromise the secret nature of the information,"[71] but we see no reason why NSA's open and informative representations to this court could not have been encouched in the initial affidavit.[72] And we suspect that the public record can be developed further still without untoward risk to the agency's statutory mission were it to exercise sufficient ingenuity.

The importance of maximizing adversary procedures in suits such as this cannot be

**66.** See note 49 *supra* and accompanying text.

**67.** See *Ray v. Turner, supra* note 46, 190 U.S.App.D.C. at 324 n.89, 587 F.2d at 1221 n.89 (concurring opinion); *Halperin v. CIA,* 446 F.Supp. 661, 664, 666–667 (D.D.C.1978) (50 U.S.C. § 403(d)(3) (1976) properly invoked to protect data not compromised by prior disclosure); *cf.* H.R.Rep.No.1380, 93d Cong., 2d Sess. 12 (1974), *reprinted in* [1974] U.S. Code.Cong. & Ad.News, 6272 (Exemption 7(E), regarding "investigative techniques and procedures," 5 U.S.C. § 552(b)(7)(E) (1976), "should not be interpreted to include routine techniques and procedures already well known to the public"); 120 Cong.Rec. 17034 (1974) (remarks of Senator Hart) (protection of investigative techniques and procedures applicable when "such techniques and procedures are not generally known outside the Government"). See also 120 Cong.Rec. 36626 (1974) (remarks of Representative Reid) ("[t]he courts, in my view, have a duty to look behind any claim of exemption, which all too often in the past has been used to cover up inefficiency or embarrassment even in foreign policy matters which, many times, are fully known by other countries but not printable in our own—supposedly the most democratic and most open in the world").

**68.** See text *supra* at note 48.

**69.** Partial disclosure still might be possible if the compromising sections of the requested documents were susceptible of deletion. See 5 U.S.C. § 552(b) (1976); *Ray v. Turner, supra*

note 46, 190 U.S.App.D.C. at 293 & n.7, 587 F.2d at 1190 & n.7 (concurring opinion); *Irons v. Gottschalk,* 179 U.S.App.D.C. 37, 41, 548 F.2d 992, 996 (1976), *cert. denied,* 434 U.S. 965, 98 S.Ct. 505, 54 L.Ed.2d 451 (1977); *Vaughn v. Rosen, supra* note 42, 157 U.S.App.D.C. at 343–345, 484 F.2d at 823–825. Significantly, NSA indicated in response to interrogatories that no review had been made to identify segregable elements of the records. J.App. 48.

**70.** See text *supra* at notes 51–56.

**71.** *Vaughn v. Rosen, supra* note 42, 157 U.S.App.D.C. at 346, 484 F.2d at 826.

**72.** At oral argument, counsel for NSA suggested that the agency must necessarily be vague until it learns precisely what the requester's arguments will be—when the agency can sharpen its claim accordingly. At most, this position buttresses the need for supplementation of conclusory affidavits during the course of trial-court proceedings; it certainly does not justify a prompting of unnecessary appeals and consequent remands. In any event, we firmly reject the notion that an agency should advance just so much as it deems essential to establish the applicability of a claimed exemption when it is able, without endangering activity that should remain secret, to supply publicly further details that well might aid the de novo determination on disclosability or nondisclosability of the desired documents. The one argument an agency may confidently anticipate is lack of specificity in its supporting papers.

gainsaid.[73] Participation of the information-requesters to the fullest extent feasible is essential to the efficacy of de novo re-examination of the agency's action.[74] Not insignificantly, the parties and the court, if sufficiently informed, may discern a means of liberating withheld documents without compromising the agency's legitimate interests. To that end, discovery may be employed to develop more fully the basis of nondisclosure or the lack of it.[75] As we have also said, "[t]he court may . . . require the agency to submit under protective seal affidavits that are more detailed than those made available to the plaintiff,"[76] and after scrutiny thereof "the court may order release of any portions of these *in camera* affidavits that it determines will present no danger of unauthorized disclosure."[77] These salutary devices were abruptly aborted in the case at bar by unquestioning reliance upon the conclusory Boardman affidavit.

It is much too soon to tell whether NSA can establish its claims by more detailed public or classified affidavits, or whether *in camera* review of the controverted documents themselves will become essential to

the resolution proper.[78] What is clear, however, is that the Boardman affidavit was inadequate to discharge the burden firmly placed by Congress on agencies that would withhold records in the face of proper Freedom of Information Act requests.[79] Indeed, the District Court's uncritical acceptance of the affidavit deprived appellant of the full de novo consideration of its records-request to which it is statutorily entitled.[80] Insofar as the sixteen documents admittedly withheld are concerned, this litigation must return to the District Court.

### III

Appellant raises a second issue on this appeal. It concerns NSA's claimed inability to locate pertinent documents in addition to the sixteen it is known to now have in hand. More precisely, appellant argues that under the circumstances the agency's single affidavit and limited interrogatories-responses claiming thoroughness in its searches did not suffice to meet its burden in that regard; additional discovery was imperative, we are told, to ensure that all relevant records have been unearthed. We agree that NSA did not demonstrate the

---

**73.** See *Ray v. Turner, supra* note 46, 190 U.S. App.D.C. at 307, 314–316, 587 F.2d at 1204, 1210–1212 (concurring opinion); *Phillippi v. CIA*, 178 U.S.App.D.C. 243, 247, 546 F.2d 1009, 1013 (1976); *Vaughn v. Rosen, supra* note 42, 157 U.S.App.D.C. at 344–345, 484 F.2d at 824–825.

**74.** See 120 Cong.Rec. 17019 (1974) (remarks of Senator Kennedy) (ex parte showing by agency should occur only "where the court determines that involvement of plaintiff's counsel in that aspect of the case would itself pose a threat to national security"). Compare *Halkin v. Helms, supra* note 49, 194 U.S.App.D.C., at 88 & n.5, 598 F.2d at 7 & n.5.

**75.** See *Ray v. Turner, supra* note 46, 190 U.S. App.D.C. at 321 n.81, 587 F.2d at 1218 n.81 ("[i]nterrogatories and depositions are especially important in a case where one party has an effective monopoly on the relevant information").

**76.** *Ray v. Turner, supra* note 46, 190 U.S.App. D.C. at 321 n.61, 587 F.2d at 1218 n.61. See *Phillippi v. CIA, supra* note 75, 178 U.S.App.

D.C. at 247, 546 F.2d at 1013. Compare *Halkin v. Helms, supra* note 49, 194 U.S.App.D.C. at 90, 598 F.2d at 9.

**77.** *Ray v. Turner, supra* note 46, 190 U.S.App. D.C. at 321 n.61, 587 F.2d at 1218 n.61.

**78.** See *id.* at 311–315, 587 F.2d at 1208–1212; text *supra* at notes 52–56.

**79.** See text *supra* at notes 52–56.

**80.** The District Court's failure to take the " 'hard look' necessary to assure adherence to congressional purpose," *Ray v. Turner, supra* note 46, 190 U.S.App.D.C., at 323, 587 F.2d at 1220, is apparent from its opinion. Noting simply that "Mr. Boardman insists that '[r]elease of any record or portion thereof would disclose information about the nature of NSA's activities including its functions,' " and that Pub.L. No.86–36 is an Exemption 3 statute, the District Court entered summary judgment for NSA without further ado. *Founding Church of Scientology v. NSA, supra* note 4, 434 F.Supp. at 633.

unavailability of other materials sufficiently to entitle it to summary judgment.

Appellant's first request, made in December, 1974, extended to all documents bearing on its activities and on transmission of information about appellant to other agencies, governments and individuals. That demand was soon broadened to include items relating to appellant's founder. In January, 1975, NSA informed appellant that it had neither established a file or record on these subjects nor passed on any information of either sort. This response, according to the Boardman affidavit, was largely "based on negative results of searches conducted at my request by the NSA organizations having files that may reasonably have contained information or records of the kinds requested." [81] On five subsequent occasions appellant specified additional subjects and submitted further details that might aid in locating pertinent materials. In each instance, Boardman reported, agency units "that could be reasonably expected to contain records of the kind described" were instructed to search their files,[82] and supposedly "thorough searches" repeatedly failed to ferret out data of the kind demanded.[83]

Subsequently, appellant learned in the course of discovery in a Freedom of Information Act proceeding against the Department of State and the Central Intelligence Agency that sixteen documents encompassed by appellant's request had been provided to CIA by NSA and that NSA had advised against their release. Once informed of that development, NSA contacted CIA to obtain identifying details; and an ensuing search uncovered fifteen of the sixteen which, Boardman said, "were found in warehouse storage, not retrievable on the basis of subject matter content." [84] NSA later obtained a copy of the sixteenth from CIA.

Beyond revelations affording this much light, the Boardman affidavit contained little else material to the processing of appellant's several requests, and NSA's replies to appellant's interrogatories were almost totally uninformative in that respect.[85] They do explain that searches were made by departments in which sought-after materials expectably might repose, and that the organization of the agency's files precluded retrieval on the basis of information furnished by appellant; and averments superficially similar did pass muster in the first of our recent *Goland* decisions.[86] However, the competence of any records-search is a matter dependent upon the circumstances of the case, and those appearing here give rise to substantial doubts about the caliber of NSA's search endeavors. More specifically, they pose the question whether further search procedures were available and within the agency's ability to utilize without expending a whit more than reasonable effort. Summary judgment, then, was improper because an issue of material fact—

---

**81.** J.App. 85.

**82.** J.App. 85, 87–88. On one other occasion, NSA was advised that appellant possessed a State Department airgram, dated several years earlier, that had been forwarded to NSA. Appellant sought clarification with respect to disposition of the airgram; and with information obtained from the Department of State the airgram was located. Boardman avows that "since the airgram was not directly required in the conduct of NSA business, it was not located in any operational file where a reasonable search . . . might have located it." J.App. 86. It seems ironic that a document more likely to be releasable because of unimportance to "NSA business" is one that proba-

bly will not be found during a "reasonable" search. Indeed, it raises some question, to say the least, about the agency's understanding of "reasonableness."

**83.** J.App. 86–88.

**84.** J.App. 89.

**85.** About the only bit of information relevant on this point is that set forth in text *infra* at note 90.

**86.** *Goland v. CIA, supra* note 54. See note 101 *infra*.

the adequacy of the search—was apparent on the record.[87]

The Boardman affidavit informs us that "[t]here is no central index to all of the Agency's files. Some files have records in alphabetical order by name, title, or subject matter. Other files are in chronological order; of these, only some, not all, have indexes by name, title, or subject matter of the records they contain."[88] In no way, however, did Boardman attempt to relate these characteristics of NSA's general filing system to the particular searches conducted for appellant. All the affidavit says, though over and over, is that almost always the quests were in vain,[89] and that, we believe, does not satisfactorily dispel the questions arising in the present situation. The fact that nothing pertinent is found on a file search might suggest, of course, that nothing pertinent was on file, but here there is a countervailing circumstance arguing powerfully the other way.

Despite searches in some number, fifteen responsive documents concededly in NSA's possession were passed by, and but for help from another intelligence agency seemingly would never have come to light. NSA tells us that its "files . . . are oriented to subjects of foreign intelligence interests and are not structured to permit retrieval by subjects of the type included in [appellant's] Freedom of Information Act request."[90] NSA adds that "[t]he fifteen records found in warehouse storage [were] not retrievable on the basis of subject matter content. Only the identifying data supplied by the CIA enabled NSA to locate copies of the records here."[91] The difficulty with this attempted explanation is that it generates more problems than it solves.

On the one hand NSA states that some of its files are indexed or alphabetically arranged "by name, title, or subject matter" —details appellant supplied profusely—and on the other hand it declares that its files "are not structured to permit retrieval by subjects of the type included in [appellant's] requests." And notwithstanding the latter representation, which would appear to immediately doom any search whatsoever for appellant, NSA professes to have conducted several, and to have done so "thoroughly." On a broader scale, since NSA's prime mission is to acquire and disseminate information to the intelligence community, it seems odd that it is without some mechanism enabling location of materials of the type appellant asked for, particularly with identifying details as extensive as those furnished. Even absent other modes of subject-matter classification, it is not at all apparent why NSA might not have searched on the basis of "subjects of foreign intelligence interests"[92] likely to be involved. Presumably, CIA was able to identify the fifteen documents on clues no different from those provided NSA by appellant and, in turn, to identify them for NSA; just why NSA could not have done that on its own is hardly evident from what NSA has offered thus far.[93] If there was no other way, just why NSA did not resort to this process of cross-communication with CIA with respect to other documents demanded by appellant is not at all clear. NSA has never claimed that the search procedures it employed were the only meth-

---

87. See text infra at notes 94–100.

88. J.App. 83–84.

89. J.App. 83–91.

90. J.App. 42.

91. J.App. 89.

92. See text supra at note 90.

93. The circumstances under which appellant learned of NSA's possession of these documents could be taken as an indication that it was not truly ignorant of the whereabouts of the documents. The Central Intelligence Agency indicated in the course of discovery in other proceedings that not only had it obtained these materials from NSA but also that NSA had admonished CIA that release should be resisted on the basis of Exemption 1. See Exhibit L to Complaint.

odology feasible and, everything considered, it has not yet eliminated an unavoidable inference that its technique may have left something to be desired.

Lest we forget, the District Court disposed of this litigation by summary judgment. It is well settled in Freedom of Information Act cases as in any others that "[s]ummary judgment may be granted only if the moving party proves that no substantial and material facts are in dispute and that he is entitled to judgment as a matter of law." [94] It is equally settled in federal procedural law that

> [t]he party seeking summary judgment has the burden of showing there is no genuine issue of material fact, even on issues where the other party would have the burden of proof at trial, and even if the opponent presents no conflicting evidentiary matter. "[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." [95]

So, to prevail in a Freedom of Information Act suit, "the defending agency must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." [96]

When the agency "has not previously segregated the requested class of records production may be required only 'where the agency [can] identify that material with reasonable effort.' " [97] And, of course, in adjudicating the adequacy of the agency's identification and retrieval efforts, the trial court may be warranted in relying upon agency affidavits, for these "are equally trustworthy when they aver that all documents have been produced or are unidentifiable as when they aver that identified documents are exempt." [98] To justify that degree of confidence, however, supporting affidavits must be " 'relatively detailed' and nonconclusory and must be submitted in good faith." [99] Even if these conditions are met the requester may nonetheless produce countervailing evidence, and if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order.[100]

NSA did not shoulder the burden cast upon summary-judgment movants by these salutary principles. Giving appellant the benefit of the inferences favorable to its cause, the record in its nebulous state simply does not establish the absence of a triable issue of fact—the adequacy of the searches NSA made.[101] To accept its claim

---

**94.** *National Cable Television Ass'n v. FCC, supra* note 55, 156 U.S.App.D.C. at 94, 479 F.2d at 186 (footnotes omitted).

**95.** *United States v. General Motors Corp.,* 171 U.S.App.D.C. 27, 48, 518 F.2d 420, 441 (1975) (footnotes omitted), quoting *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176, 177 (1962). Accord, *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 160, 90 S.Ct. 1598, 1609–1610, 26 L.Ed.2d 142, 155–156 (1970); *Bouchard v. Washington,* 168 U.S.App. D.C. 402, 405, 514 F.2d 824, 827 (1975); *Bloomgarden v. Coyer,* 156 U.S.App.D.C. 109, 114– 116, 479 F.2d 201, 206–208 (1973); *Nyhus v. Travel Management Corp.,* 151 U.S.App.D.C. 269, 281, 466 F.2d 440, 442 (1972).

**96.** *National Cable Television Ass'n v. FCC, supra* note 55, 156 U.S.App.D.C. at 94, 479 F.2d at 186 (footnotes omitted).

**97.** *Goland v. CIA, supra* note 54, 197 U.S.App. D.C. at 39–40, 607 F.2d at 353–354, quoting *Na-*

*tional Cable Television Ass'n v. FCC, supra* note 55, 156 U.S.App.D.C. at 100, 479 F.2d at 192. See H.R.Rep.No.876, 93d Cong., 2d Sess. 5–6 (1974); S.Rep.No.854, 93d Cong., 2d Sess. 9–10 (1974). But *cf. Vaughn v. Rosen, supra* note 42, 157 U.S.App.D.C. at 348 & n.23, 484 F.2d at 828 & n.23 (encouraging agencies "to create internal procedures that will assure that disclosable information can be easily separated from that which is exempt").

**98.** *Goland v. CIA, supra* note 54, 197 U.S.App. D.C. at 38, 607 F.2d at 352.

**99.** *Id.* (footnote omitted), quoting *Vaughn v. Rosen, supra* note 42, 157 U.S.App.D.C. at 346, 484 F.2d at 826.

**100.** See text *supra* at notes 94–96.

**101.** The situation here is significantly variant from that presented in *Goland v. CIA, supra* note 54, decided on rehearing, March 28, 1979. When *Goland* was first considered by this

of inability to retrieve the requested documents in the circumstances presented is to raise the specter of easy circumvention of the Freedom of Information Act. Few if any requesters will be better informed than appellant on the particulars of data that may have been obtained clandestinely by a governmental intelligence agency.[102] To be sure, an agency is not " 'required to reorganize its [files] in response to' " a demand for information,[103] but it does have a firm statutory duty to make reasonable efforts to satisfy it.[104] If the agency can lightly avoid its responsibilities by laxity in identification or retrieval of desired materials, the majes-

tic goals of the Act will soon pass beyond reach. And if, in the face of well-defined requests and positive indications of overlooked materials, an agency can so easily avoid adversary scrutiny of its search techniques, the Act will inevitably become nugatory. In the situation before us, undiscriminating adoption of NSA's ill-elucidated assertions of thoroughness in its searches would threaten to excuse it substantially from the operation of the Act.

We conclude, then, that the case warranted a more exhaustive account of NSA's search procedures than it advanced. That

court, the record on appeal incorporated affidavit attesting to the reasonableness of the agency's search, but relatively little to indicate the contrary. 197 U.S.App.D.C. at 39–41, 607 F.2d at 353–355. The court thus found no error in the grant of summary judgment for the agency, without awaiting discovery efforts by the requesters in the bare hope of falling upon something that might impugn the affidavits. *Id.* at 41, 607 F.2d at 355.

On rehearing, the court adhered to that holding notwithstanding the emergence—about a year and half after the District Court's judgment—of numerous materials theretofore sought by the requesters, and the agency's delay of several months more in releasing them. *Goland v. CIA,* 197 U.S.App.D.C. 25, 53–58, 607 F.2d 339, 367–372 (D.C.Cir. 1979) (opinion on rehearing). Additional unopposed affidavits filed by the agency on rehearing explained that because these items were unindexed and largely in storage among 84,000 cubic feet of inactive data at a retired-records center, they were irretrievable by normal procedures; and that they were located only because a law librarian had chanced upon them during the course of independent research on unrelated projects. *Id.* at 53–54, 56, 607 F.2d at 367–368, 370. Very importantly, long before these materials were unearthed the District Court's adjudication on the search issue had achieved finality, and had passed beyond that court's power to alter on account of after-discovered evidence. Fed.R. Civ.P. 60(b). Consequently, whatever evidentiary reflections the sudden appearance of the newly-found documents might normally have had on the caliber of the original search were necessarily tempered by the deep-rooted policy fostering the stability of judgments. See *id.* at 56, 607 F.2d at 370.

*Goland* acknowledged that "the discovery of additional documents is more probative that the search was not thorough than if no other documents were found to exist," *id.* at 56, 607

F.2d at 370, and that "the delay in disclosing the documents at least arguably evidences a lack of vigor, if not candor, in responding to Freedom of Information Act requests," *id.,* but concluded simply that these inferences provided too weak a basis for a remand under 28 U.S.C. § 2106 (1976) for proceedings envisioning possible reopening of the District Court's final judgment, even assuming the propriety of that course of procedure. *Id.* at 57–58, 607 F. 2d at 371–372. See *Realty Acceptance Corp. v. Montgomery,* 284 U.S. 547, 52 S.Ct. 215, 76 L.Ed. 476 (1932). In the case at bar, however, we encounter none of these strictures, for unlike *Goland* there is no problem of evidence outside the record on appeal. When the District Court ruled, it had before it all of the vital information tending to indicate that NSA's search was less than painstaking—location of the fifteen documents after communication with the Central Intelligence Agency, in the milieu of grave uncertainty as to just what the prior searches had involved and faced. See text *supra* at notes 80–93. And we must remain advertent to the consideration that on NSA's motion for summary judgment appellant was entitled to the benefit of all favorable inferences to be drawn from those circumstances. See text *supra* at note 95. The difference between the two cases is thus that there the court dealt with the portent of post-judgment evidence for either Rule 60(b) or § 2106, and here the concern is rather with the impact of record evidence and evidentiary gaps upon the availability of summary judgment.

**102.** See also note 82 *supra.*

**103.** *Goland v. CIA* (opinion on rehearing), *supra* note 101, 197 U.S.App.D.C. at 56, 607 F.2d at 370.

**104.** See text *supra* at note 97.

reckoning is now due, and to the extent practicable it should be made on the public record.[105] Following that, it may well become necessary for the District Court to entertain *in camera* affidavits [106] in order to assess de novo whether NSA has met its burden. The end result of that degree of attention to the problem by the litigants and the court may be origination of search procedures at once efficacious and reasonable. The Freedom of Information Act summons at least a conscientious effort in that direction.[107]

The summary judgment for NSA is reversed. The case is remanded to the District Court for further proceedings consistent with this opinion.[108]

*So ordered.*

**105.** See text *supra* at notes 51–56.

**106.** See text *supra* at note 56. *In camera* review of the sixteen known documents may become an integral part of the effort to ascertain why they might have been overlooked during the initial searches.

**107.** We repeat the admonition that "[a]gencies should continue to keep in mind . . . that 'their superior knowledge of the contents of their files should be used to further the philosophy of the act by facilitating, rather than hin-

dering the handling of requests for records.'" S.Rep.No.854, *supra* note 97, at 10, quoting Attorney General's Memorandum on the Freedom of Information Act 24 (1969).

**108.** Our action is not to be taken as an instruction to the District Court to *order* NSA to canvass its files for responsive records. We remand simply for fuller enlightenment on the agency's procedures to determine whether they failed and, if so, to direct it to try anew, this time utilizing reasonable search procedures that might more fully comport with the fundamental purposes of the Act.