**Graeme SEPHTON, Plaintiff,**

v.

**FEDERAL BUREAU OF INVESTIGATION,
Defendant.**

No. CIV.A. 00–30121–MAP.

United States District Court,
D. Massachusetts.

March 29, 2005.

Caroline Carrithers, Ashfield, for Graeme Sephton, Plaintiff.

Karen L. Goodwin, United States Attorney's Office, Springfield, for Federal Bureau of Investigation, Defendant.

Daniel J. Stotter, BBH Resources # 109, Palm Springs, CA, for Graeme Sephton, Plaintiff.

Robert Wolkon, Wolkon & Pascucci, LLP, Boston, for Graeme Sephton, Plaintiff.

## MEMORANDUM AND ORDER WITH REGARD TO MOTIONS FOR SUMMARY JUDGMENT

**(Docket Nos. 68 & 75)**

PONSOR, District Judge.

### I. INTRODUCTION

At approximately 8:20 p.m. on July 17, 1996 a Trans World Airlines Boeing 747, Flight 800, carrying 212 passengers and a crew of eighteen left John F. Kennedy International airport bound for Charles DeGaulle International airport in Paris, France. About ten minutes later, the plane crashed into the Atlantic Ocean near East Moriches, New York. All 230 persons on board perished.

Following an investigation, the National Transportation Safety Board determined that the probable cause of the crash was an explosion in the center wing fuel tank. The source of ignition for the explosion could not be determined with certainty, but, according to the NTSB, it was "most likely" a short circuit that allowed excessive voltage to enter the tank through wiring that was part of the fuel quantity indication system. *See Aircraft Accident Report: In-flight Breakup Over the Atlantic Ocean, Trans World Airlines Flight 800, Boeing 747–131, N93119, Near East Moriches, New York, July 17, 1996,* NTSB Number AAR–00/03 (August 23, 2000).[1]

Plaintiff, Graeme Sephton, is a member of the Flight 800 Independent Research Organization, an unofficial organization, supported by family members of victims, that has been attempting to conduct an independent investigation into the crash. Sephton submitted requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking release of documents from the Federal Bureau of Investigation ("FBI") concerning its investigation of the tragedy.

The process did not go smoothly. The FBI initially resisted producing any documents at all, then released a few pages, and finally was, in essence, embarrassed into producing several hundred additional pages of material. Now, the FBI takes the position that it has conducted a "reasonable" search for materials responsive to plaintiff's request, that all pertinent documents have been produced, and it should not be required to continue what it views as a vain search. The plaintiff contends that the agency's response still falls short of the effort required by FOIA.

After a very lengthy procedural history, described below, the parties now stand once more before this court offering cross motions for summary judgment. For the reasons set forth below, the court will deny plaintiff's motion and allow defendant's motion.

A few words are appropriate before the court enters into the substance of its analysis. This has been a very difficult case. Its history has included, so far, three trips to the Court of Appeals and the death of the judge who originally presided. The FBI's halting response to the plaintiff's

---

**1.** The report is available at http://www.ntsb.gov/Pub-  lictn/2000/AAR0003.pdf.

requests has exacerbated an already excruciating situation and undoubtedly deepened the mistrust felt by the grieving families who have supported this FOIA initiative. The families deserved better from their government.

Despite this, I am convinced that the efforts of the FBI, at this time, comport with the law. Could more documents possibly exist? Given the reservoirs of records in government hands, it is hypothetically possible, though very unlikely. Has the FBI deliberately concealed anything from the plaintiff? No, the agency's errors during this process have been ones of rigidity and negligence. Do the affidavits submitted by the FBI now confirm that, as a matter of law, it has carried out its responsibility to conduct a "reasonable search," as that phrase has been construed by the First Circuit? Yes.

## II. PROCEDURAL HISTORY

This case's tangled history begins on September 21, 1998, when, by letter to the FBI New York Field Office, Sephton made a FOIA request for information relating to the FBI's investigation into the crash of Flight 800. In his request Sephton sought (1) a listing of all foreign material and objects removed or recovered from the victims' bodies, and (2) the results of any forensic analyses performed by the FBI on such objects and materials.[2]

Citing 5 U.S.C. § 552(b)(7)(A)(barring access to information or records relating to law enforcement purposes, the release of which could reasonably be expected to interfere or compromise ongoing an ongoing

investigation) the FBI denied this request in its entirety on September 29, 1998. On November 20, 1998, Sephton appealed the FBI's denial in accordance with the instructions provided in the response letter. Three months later, on February 23, 2000, the FBI informed Sephton that it would no longer withhold the requested documents under § 552(b)(7)(A). The FBI thereafter released fourteen pages of material along with an information sheet indicating an exclusion of one responsive document, totaling seven pages, on the ground that its release would violate the secrecy of federal grand jury proceedings. *See*, 5 U.S.C. § 552(b)(3).

After exhausting his administrative remedies, Sephton filed the current action on July 17, 2000, seeking disclosure of the withheld documents. The case was drawn at that time to Senior Judge Frank H. Freedman. Claiming bad faith by the FBI in withholding the seven pages of information, Sephton sought a preliminary injunction ordering the FBI to conduct a thorough, good faith search of its records and to release the requested material immediately. By order of September 13, 2000, Judge Freedman denied this request, finding there to be no showing of irreparable harm if the injunction were not granted.

The parties, thereafter, filed cross-motions for summary judgment. The FBI's motion cited the affidavit of Scott A. Hodes, an FBI attorney, which described the Central Records System ("CRS") used by the FBI to maintain information, reviewed the process by which the CRS was

---

**2.** Specifically, Sephton's request sought, "A schedule or listing (sic) such items given to the FBI, and the results of analysis of those objects. Most importantly the identification of the origin of all such material in relation to the 747 aircraft layout (assuming such material did originate from the 747 and its contents) and the victim's supposed location. Was any of this material of unknown origin. Please forward to me all documents that deal with the following data about each foreign object: size, weight, condition and general description, and all other analytic results including composition." Sephton 9/21/98 FOIA Request, Docket No. 3, Exhibit A.

searched for records responsive to Sephton's request, and provided a summary of the documents withheld. Relying largely on the Hodes affidavit, Judge Freedman allowed the FBI's motion for summary judgment and denied Sephton's motion on August 29, 2000. The court concluded that the FBI had adequately searched the CRS and satisfied its burden to prove it properly withheld the requested documents pursuant to 5 U.S.C. § 552(b)(3) and Fed. R.Crim.P. 6(e).

Sephton gave notice of appeal to the First Circuit on October 22, 2001. Prior to the assignment date for argument, however, the FBI requested that the First Circuit remand the case for further consideration of whether the release of certain information would constitute, an unwarranted invasion of privacy. The First Circuit did remand the case on March 14, 2002, preserving for the plaintiff his right to appeal the final decision of the district court following any further proceedings.

On remand, the parties stipulated and agreed to the release of the remaining seven pages of documents, with certain redactions. In addition, the plaintiff agreed he would not further challenge these redactions and that the case would be returned to the First Circuit for decision solely on the issue of the adequacy of the FBI's search for *other* possibly responsive records. The case was returned to the First Circuit by court order of July 12, 2002.

On October 16, 2002, the First Circuit remanded the case to Judge Freedman for the limited purpose of having the record supplemented with an additional affidavit from the FBI. The court requested that the defendant's supplementation describe the approximate size of the relevant file and the method employed to search it for records responsive to Sephton's initial request. In remanding the matter, the First Circuit retained jurisdiction and stated that: "upon submission of [the requested] affidavit, the district court can then transmit it to us with an indication that it wishes either (a) to affirm its original decision, or (b) to have us relinquish jurisdiction so that it may vacate its prior judgment and conduct whatever further proceedings it deems necessary." *Sephton v. Federal Bureau of Investigation,* No. 01–2502 (1st Cir. Oct. 16, 2002) (order remanding to the district court). The Court of Appeals urged expediency in the FBI's submission, and requested that all efforts be made to complete the remand process within sixty days of its order.

On December 12, 2002, the FBI filed the affidavit of Christine Kiefer, an attorney and Acting Chief of the Litigation Unit, Freedom of Information–Privacy Act Section, Records Management Division, at the FBI Headquarters in Washington, D.C. Accompanying the affidavit, the defendant filed a supplemental memorandum in support of its motion for summary judgment.

A flurry of filings followed soon after the appearance of the FBI's supplemental affidavit and memorandum. On January 24, 2003, Sephton replied to the defendant's supplemental memorandum in support of summary judgment with his own supplemental memorandum in opposition. In addition, he obtained permission to introduce new evidence into the record. The FBI then obtained two extensions to investigate the plaintiff's additional evidence and to explore settlement of the case in its entirety.

Following rejection by Sephton of the FBI's settlement offer, the government on April 25, 2003, moved for an extension of time to reply to plaintiff's most recent memorandum. Judge Freedman granted the final extension on April 28, 2003.

During the months that the case was on remand, more than four years after the initial written request, the FBI released to Sephton approximately 550 additional pages of responsive documents it had discovered in the New York Field Office. These documents were found as a result of a line-by-line search by the FBI of the relevant files within the CRS in response to Sephton's January 24, 2003 memorandum, wherein he specified other individuals known to him who had received, pursuant to their own FOIA requests, documents responsive to Sephton's request that he had never received. Following Judge Freedman's April 28 order, the defendant in its reply submitted the affidavit of Eileen Rawlinson, dated April 29, 2003, explaining how the additional documents were originally overlooked and further describing the FBI's search of its files.

On June 18, 2003, plaintiff requested, and was given, leave to submit a reply to the FBI's supplemental memorandum after reviewing these new documents. Sephton took the position in this reply, filed July 31, 2003, that the FBI's search for documents responsive to his request remained inadequate and that "[a]mazingly, of the almost six hundred pages of records that the FBI sent to [him] ... only one contains any analysis of the foreign bodies located on the victims." Docket No. 49, at 2.

Meanwhile, on June 23, 2003, the delay caused by the additional submissions on remand prompted the First Circuit to issue an order requiring the district court to comply with its order of October 16, 2002 within thirty days. *See*, Docket No. 46. In response, Judge Freedman issued a memo explaining the reasons for the delay and requesting additional time to September 1 to render his decision. Docket No. 47.

Tragically, Judge Freedman unexpectedly died on August 22, 2003, before his response to the First Circuit's Order could be completed. The undersigned, with the agreement of the Chief Judge of this District, ordered the case transferred to him immediately and issued a Memorandum on August 27, 2003, addressing the issue presented by the First Circuit on remand. In this memo, the court recognized that the case had been remanded for the "limited purpose of supplementation of the record with [an affidavit from the FBI]" and, therefore, disregarded the recent submissions, concluding "that [Judge Freedman's] original decision was correct in light of the record as supplemented by the affidavit" and requesting that the First Circuit affirm his decision. *See*, Docket No. 53, at 4.

In *Sephton v. Federal Bureau of Investigation*, No. 01–2502, 78 Fed.Appx. 722, 2003 U.S.App. LEXIS 21763 (1st Cir. October 24, 2003), the First Circuit found that the district court properly addressed the issue within the scope of the remand order. However, the court then went on to say that, in light of the additional five hundred pages of documents produced, it was preferable now to permit the district court to consider the filings beyond the FBI affidavit, in order to analyze the adequacy of the FBI's search in response to the plaintiff's FOIA request. The Court of Appeals vacated the previous judgment and remanded the case to allow further proceedings necessary to resolve the FOIA issues raised by Sephton.

Following a status conference on March 29, 2004, this court issued a Scheduling Order directing counsel to submit memoranda summarizing precisely what issues remained to be resolved and setting forth each party's position with regard to these issues.

In their responsive memoranda, plaintiff and defendant agreed that the sole remaining issue was the adequacy of the FBI's search for responsive documents. On April 26, 2004, plaintiff renewed his motion for summary judgement on this point, seeking a ruling by this court that the FBI's search for documents was inadequate as a matter of law.

On June 10, 2004, the FBI filed its own renewed motion for summary judgment, Docket No. 75, and submitted a fourth affidavit, this time by Gregory A. Carl, Chief of the FBI's Explosives Unit, rebutting certain averments made in the plaintiff's materials.

The parties appeared for argument on October 5, 2004. At the conclusion of the hearing, it was agreed that counsel would make final written submissions. Counsel for the defendant, responding to plaintiff's complaint that no one at the FBI had ever affirmatively stated that the agency's search was reasonably calculated to uncover the requested documents, agreed to submit an affidavit to that effect. The plaintiff agreed to submit a proposed order detailing what, precisely, he sought this court to order the FBI to do to perform a search that he would find adequate.

On November 2, 2004, the plaintiff submitted his proposed order. On the same day, the defendant submitted a memorandum declining, upon further consideration, to submit the confirmatory affidavit it had agreed to produce. The FBI's search for documents, the memorandum argued, had fully complied with the statute and the requirements of First Circuit law, and it was therefore "up to the court to conclude, as a matter of law, whether that search was reasonably calculated to discover the requested documents." Docket No. 84, at 3.

## III. *DISCUSSION*

The First Circuit has described, on several occasions, the standards by which the adequacy of an agency's search pursuant to FOIA must be evaluated. *See, e.g., Church of Scientology Int'l. v. U.S. Department of Justice,* 30 F.3d 224, 230 (1st Cir.1994); *Maynard v. CIA,* 986 F.2d 547, 559–60 (1st Cir.1993); *Gillin v. IRS,* 980 F.2d 819, 821–22 (1st Cir.1992). As Judge Campbell has stated: "The crucial issue is not whether relevant documents *might* exist, but whether the agency's search was reasonably calculated to discover the requested documents." *Maynard* at 559 (emphasis supplied) (internal quotation omitted). *See also, SafeCard Servs. Inc. v. S.E.C.,* 926 F.2d 1197, 1201 (D.C.Cir.1991).

The reasonableness of a search depends on the facts of each case. *Maynard* at 559. To support its claim that a search was adequate, "the agency may rely upon affidavits provided they are relatively detailed and nonconclusory, and are submitted by responsible agency officials in good faith." *Id.* Upon submission of affidavits, "the FOIA requester can rebut the agency's affidavit only by a showing that the agency's search was not made in good faith." *Id.* "An agency's affidavit is accorded a presumption of good faith which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Id,* at 560 (citations omitted).

To date, there have been four affidavits filed by the FBI in support of its assertion that the search conducted in response to plaintiff's request was adequate. They are: (1) the October 19, 2000, Declaration of Scott A. Hodes ("Hodes Declaration"); (2) the December 11, 2002, Declaration of Christine Kiefer ("Kiefer Declaration"); (3) the April 29, 2003, Declaration of Eileen Rawlinson ("Rawlinson Declaration");

and (4) the June 7, 2004, Declaration of Gregory A. Carl ("Carl Declaration").[3]

A review of these affidavits reveals that they describe, in a detailed and nonconclusory fashion, the structure of the agency's file system, the scope of the search performed, and the method by which it was conducted. As will be seen, the evidence presented by the plaintiff is insufficient to rebut the presumption of good faith that arises from this showing.

## A. *Hodes Declaration*

Scott Hodes was, at the time of his declaration, the Acting Unit Chief of the Litigation Unit, Freedom of Information–Privacy Acts Section, Office of Public and Congressional Affairs at the FBI Headquarters in Washington, D.C. His affidavit provided a chronology of the correspondences between plaintiff and defendant, and described both the record keeping system employed by the FBI and the procedures by which it was searched in response to Sephton's request.

As described by Hodes, the CRS is the means by which the FBI catalogues and maintains all pertinent information acquired in connection with its law enforcement responsibilities. The CRS "consists of a numerical sequence of files broken down according to subject matter." Hodes Declaration, at 5. In order to utilize the information contained within the CRS, the FBI has General Indices, arranged in alphabetical order, and accessible by the FBI Headquarters and each field division. A "main" index reference refers to the main subject matter that is contained within the system, whereas a "cross-reference" index contains items which only mention a topic within the body of a file concerning an investigation of another individual, organization or event.

In response to Sephton's request, which was addressed to the New York Field Office, the CRS was searched and one main index file was located. This file was identified as 265A–NY–259028–Sub–FF and was captioned "Unsubs(s); Explosion of TWA Flight 800, July 17, 1996; Acts of Terrorism–International Terrorist." Hodes Declaration, at 6. Upon an initial review of the file six documents and an attachment, totaling twenty-eight pages, were identified.

Based upon his review Hodes affirmatively stated, under oath, on October 19, 2000 that "[a]ll substantive information concerning plaintiff's request has been released unless such release would infringe upon the privacy of a third party or violate a statute of law." Hodes Declaration at 15.

## B. *Kiefer Declaration*

As described above, after remand by the First Circuit in October 2002, the FBI submitted an additional affidavit to describe the size of the file searched and the method used to respond to the plaintiff's FOIA request. This was the Kiefer Declaration.

In her affidavit, Kiefer described the located file, 265A–NY–259028, as containing approximately 80,000 pages, divided among various sub files. In total, the main file 265A–NY–259028 was subdivided

---

**3.** Plaintiff, in his Supplemental Declaration dated July 15, 2004, Docket No. 80, argues that the Carl Declaration is responsive to a separate and subsequent FOIA request made June 16, 2003, and not at issue here. However, because the Carl Declaration explicitly states it is in response to the affidavit of Dr. Frederic W. Whitehurst filed by plaintiff in this case, the court will consider it. The passing reference to Sephton's separate FOIA request does not negate the utility of this affidavit with regard to the issues raised by Dr. Whitehurst.

into ninety-seven categorized sub files. Kiefer Declaration, at 3.

In response to plaintiff's request, a Paralegal Specialist at the New York Field Office reviewed the list of the ninety-seven sub files and determined that responsive documents, if they existed, would be located in Sub FF, titled "Recovery Effort—Moriches/Grumman." This sub file, divided further into six subdivisions, comprised approximately 2,000 pages.[4] The Paralegal Specialist conducted a page by page search of the entire Sub FF file, including its subdivisions, to confirm that all responsive documents had been produced. Kiefer Declaration, at 3.

Based upon this search, Kiefer confirmed, under oath on December 11, 2002, that "[a]ll responsive material located was processed for release to requester." Kiefer Declaration at 4.

## C. *Rawlinson Declaration*

Eileen Rawlinson identified herself as the Supervisor of the Freedom of Information–Privacy Acts (FOIPA) Group within the Legal Unit of the FBI's New York Office. Her affidavit was submitted following the discovery of over 500 additional pages of information responsive to plaintiff's request. The existence of this large cache of undisclosed material was brought to the defendant's attention by Sephton, who had learned of it through contacts of his who were making independent FOIA requests.

The Rawlinson Declaration described the line by line search conducted by the New York Field Office of the SubFF file, as well as another file called the "Sub LAB" file. In conducting her search, Rawlinson discovered within the SubFF–3 (Medical Examiners Reports) sub-file an envelope containing a CD–Rom. Contained on the CD–Rom was a report entitled "Evidence/Medical Examiner Report—Sort by Seat" with information responsive to plaintiff's request. No paper copy of the report existed at the time of the initial search. Rawlinson Declaration, at 4.

In addition, Rawlinson and her staff searched for documents in another sub-file in the 265A–NY–259028 file, identified as "1B Evidence," which pertained to physical evidence. These documents were maintained in the main file, but not in the SubFF directory, and the actual, physical evidence was maintained at an offsite location.

The computer indices were searched, and the descriptions of over 700 entries relating to recovered physical evidence were reviewed. Having identified from the descriptions items collected in evidence that might be responsive to plaintiff's request, Rawlinson manually searched the "FD–340a (1A)" envelopes that were annexed to the main file to locate the so-called "FD–192" forms. These forms, commonly referred to as "green sheets," are used by the FBI to keep track of evidence. Eventually, Rawlinson located the original FD–192s forms or printed the relevant indices directly from the computer (in the eight cases where the original forms were not located) for all items that were considered "foreign material/objects removed from the victims bodies" in response to plaintiff's request. Rawlinson Declaration, at 5. She then forwarded the

---

4.  The subdivisions were:
    SubFF1–Copies of outgoing leads/lab requests
    SubFF2–Lab reports-Moriches/Grumman
    SubFF3–Medical Examiners Reports

    SubFF4–Temporary Morgue Reports
    SubFF5–Dive Sheets/Logs
    SubFF6–Recovery/Review of victim's personal effects

report discovered on the CD–Rom and copies of the FD–192s responsive to Sephton's request to FBI Headquarters for processing prior to release.

In addition to her explanation of the searches conducted by her office, Rawlinson addressed an issue raised by Sephton relating to electronic communications folders contained within the Sub–FF directory, as well as separate files for the FBI Laboratory and Scientific Analysis Section. Regarding plaintiff's claim that an electronic communications folder was separately maintained within the Sub–FF files, Rawlinson stated that, to the contrary, no additional folders were maintained within the Sub–FF directory. To demonstrate this, Rawlinson noted that her line-by-line search of the directory uncovered no such folders. The Rawlinson Declaration finally stated that if there were files separately maintained by the FBI Laboratory and Scientific Analysis sections then they were not located within the New York Field Office.

As with the Hodes and Kiefer affidavits, Rawlinson's affidavit swears under the pains and penalties of perjury that all information responsive to plaintiff's request was "located, processed and released to the plaintiff." Rawlinson Declaration at 7.

### D. *Carl Declaration*

The final affidavit was submitted specifically "to respond to factual issues raised [by plaintiff] in the Affidavit of Dr. Frederick W. Whitehurst dated December 2, 2002." Carl Declaration, at 2. Gregory A. Carl identified himself as the Unit Chief of the Explosive Unit, Scientific Analysis Section, Laboratory Unit.

The Carl Declaration asserted that the FBI laboratory has not at any time since 1995, maintained a records system that was separate from the CRS system.[5] According to his explanation of the laboratory's procedure, whenever a report was generated by the laboratory an electronic copy of it was uploaded to the submitting office's electronic case file within the CRS. In addition, a paper copy of the report was forwarded to the office. All notes and other working papers that were generated in the course of the examination were placed in an envelope and maintained at the laboratory. A description of the contents of the envelope was then electronically entered into the CRS, which was accessible to, and searchable by, the field offices.

The Carl declaration states affirmatively that "the FBI Laboratory was requested to conduct a search for the documents described" in plaintiff's FOIA request and that "a search was conducted of all paper files over which the Laboratory has control and of the database formerly known as EXPRESS." On June 7, 2004, under the pains and penalties of perjury he confirmed that neither search turned up any responsive documents. Carl Declaration at 4.

Taken in total, the four affidavits submitted by the defendant provide the court with a detailed explanation of the structure

---

**5.** The Carl Declaration did describe a database called EXPeRT (formerly EXPRESS) that was maintained separately by the Explosive Unit. This was a stand-alone system, but it contained only records that were already within the CRS and "publically available reference literature published by third parties." Carl Declaration, at 3. In addition, there was another database, the ERF, which essentially was a repository for reference items and reference literature, not material directly related to a specific matter under investigation. This database was used primarily for comparison during forensic examinations. Neither the EXPeRT or ERF would yield documents responsive to plaintiff's request that were not also located within the CRS.

of the FBI's file system. In addition, the Kiefer Declaration and Rawlinson Declaration in particular describe, in a nonconclusory fashion, the scope of the search performed and the methods by which it was conducted. These affidavits, submitted by the responsible agency officials, are afforded the presumption that they have been offered in good faith. *See Maynard* at 560. In light of this showing, the plaintiff must rebut the good faith presumption generated by the agency's affidavits with more than "pure[ ] speculations about the existence and discoverability of other documents." *Maynard* at 559.

Plaintiff has pointed to material that, he says, demonstrates that the FBI's search was inadequate and therefore lacking in good faith. These supporting documents include declarations made by Sephton himself, the affidavit of Dr. Whitehurst, and statements made by FBI officials before a Senate Committee. Through these submissions, the plaintiff contends that additional documents exist that are responsive to his request and that a reasonable search would have discovered.

Before addressing the plaintiff's contentions specifically, a few general guideposts in mind should be noted. It is well established that a "document [which] refers to the existence of other records does not independently generate an issue of material fact rendering summary judgment improper so long as reasonably detailed, nonconclusory affidavits demonstrate the reasonableness of the agency's search." *Maynard*, at 562. In addition, "[t]here is no requirement that an agency search every record system . . . Rather, an agency need only provide a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials were searched." *Id.;* at 563 (internal quotes omitted).

Sephton relies on the affidavit of Dr. Whitehurst to support his assertion that the FBI maintains record and filing systems separate from the CRS. The Carl Declaration, however, states flatly that "[t]he FBI Laboratory does not have nor has it had at any time since 1995 a records management system that contains records that are not maintained in the FBI's Central Record System." Carl Declaration, at 2. Any report generated by the laboratory, according to Carl, is uploaded to the CRS. The plaintiff's claim that other records *might* exist in some other filing system is conjectural and insufficient to demonstrate bad faith on the part of the defendant.

Sephton further contends that certain envelopes pertaining to forensic investigations were not searched and might contain information responsive to his request. Again, the Carl Declaration addressed this issue directly and indicated that each envelope was assigned a serial number which was then entered into the CRS with a description of the envelope's contents. Carl Declaration, at 2. Thus, while the physical contents of the envelopes were not searchable from the CRS, a description of their contents was included in the field office's electronic case file. If responsive documents existed within these envelopes, an indication of that within the CRS would appear as part of the envelope's description. Next, plaintiff posits that the FBI search was inadequate because it did not explore all the sub-directories within the main file, 265A–NY–259028. He identifies various other sub-files which, in his opinion, might contain additional responsive documents.

Once again, however, plaintiff's claim fails in light of the procedures described in the Kiefer Declaration and Rawlinson Declaration. The FBI's determination that responsive information, if it existed, would be found with Sub–File FF was reasonable

as a matter of law, and its contents were searched at least twice, once through a page by page search a second time line by line. It would of course be preferable, from the plaintiff's viewpoint, to have the defendant review every single document in every single file in its possession, or at least in every single file that might *conceivably* contain responsive information, to see if relevant material might somehow be uncovered. Where the death of a loved one is concerned, this desire is natural. This kind of effort, however, is not what the FOIA requires. The standard is "reasonableness," and it has been satisfied.

■ Plaintiff, relying on *Oglesby v. U.S. Dept. of Army*, 920 F.2d 57 (D.C.Cir.1990), argues that the FBI had a duty to search *all* records systems and locations which might have had records responsive to Plaintiff's FOIA request. *Oglesby* places no such responsibility on the FBI, and plaintiff's logic was explicitly rejected by the First Circuit in *Maynard*.

The Court of Appeals in *Oglesby*, after taking note of the general rule that "[t]here is no requirement that an agency search every record system," went on to find the State Department had improperly limited the search to one record system when there were admittedly *other* systems used by the Department that might have contained responsive records. *Oglesby*, at 68. The facts of this case do not support a similar finding.

There has been no non-speculative showing that the FBI has additional records systems it has not searched that might contain responsive documents. The four affidavits submitted by the defendant specifically confirmed that *all* information relating to its investigations was catalogued and stored within the CRS. While there are other databases such as EX-PeRT and ENF which serve as repositories for information, any documents relating to an investigation that may be located within them were also stored within the CRS. This case bears no resemblance to *Oglesby*.

■ Sephton argues that the FBI has turned over only one document that contains actual forensic evaluation and analysis. This, he says, is evidence of the inadequacy of the searches conducted. Plaintiff's argument is grounded on his assumption that, because he has not so far received documents he would like to have, they *must* exist elsewhere within the FBI. This form of speculation is of course always possible, and perhaps inevitable, but it is not adequate to rebut the presumption of good faith generated by the agency's affidavits in the context of litigation pursuant to FOIA.

Distilled from the affidavits, the FBI's position now is straightforward: apart from the actual physical material recovered from the bodies of the crash victims, it has given plaintiff all the information that it could reasonably locate responsive to his requests, including all analyses and underlying data. The submissions by the responsible officials describe in a nonconclusory fashion the records searched and the method employed in making this reasonable effort. Under the law, that is enough.

Plaintiff understandably points to the release of additional documents subsequent to this lawsuit, and the FBI's shifting legal positions, in urging the court to be skeptical of its claim now that its job was adequate. Given the history of this case, the court has some sympathy for this argument. It is not surprising that the plaintiff finds it difficult to take the government at its word.

However, as the First Circuit has stated: "Delay in locating a document 'is significant only to the extent that evidence

shows that the delay resulted from bad faith refusal to cooperate.'" *Maynard,* at 564 (quoting *Miller v. United States Dep't of State,* 779 F.2d 1378, 1386 (8th Cir. 1985)). Moreover, courts have found that, to some extent, production of additional material may support the FBI's claim of good faith. "[T]he additional releases suggest a stronger, rather than a weaker, basis for accepting the integrity of the search." *Meeropol v. Meese,* 790 F.2d 942, 953 (D.C.Cir.1986)(internal quotes removed).

The court has noted with sharp disappointment the most recent change in position by the FBI: agreeing, and then declining, to submit a further affidavit setting forth what was characterized at oral argument as "magic language," confirming in conclusory terms that a reasonable search was performed for responsive documents. This latest change in position is most regrettable. It risks further deepening the skepticism of the plaintiffs at the FBI's good faith. The court has, however, reviewed the affidavits already submitted and finds that each one contains, explicitly or by clear implication, a sworn statement that a reasonable search has indeed been performed.

This litigation has long ago passed any possibility that the defendant could be playing with words to deceive the court or the plaintiffs. The FBI has for some time known exactly what plaintiff is seeking; it has now stated repeatedly under oath that it has made a careful search of all files where responsive documents might reside and has produced those documents. If the FBI has, in fact, *not* conducted a reasonable search, then four highly placed officials are either lying under oath, or (what amounts to the same) deliberately misleading the court—thereby jeopardizing their careers and risking a citation for contempt.

This record contains no evidence that any such inexplicably egregious misconduct has occurred.

Finally, it is not possible to conclude this memorandum without a statement of sympathy and respect for the plaintiff and the grieving families he represents. Although FOIA gives the citizen the power to demand information from his or her government, that power is balanced by the standard of reasonableness. This standard recognizes the practical reality that, even in light of FOIA, some modicum of trust must, in the end, be afforded to conscientious officials sincerely attempting to comply with the law. On several occasions the responses of the FBI have unfortunately eroded that trust and made this case much harder. At this point, however, the law is clear that the end of the journey has been reached.

## IV. CONCLUSION

For the reasons set forth above, plaintiff's Motion for Summary Judgment (Docket No. 68) is hereby DENIED, and defendant's Motion for Summary Judgment (Docket No. 75) is hereby ALLOWED. The clerk is ordered to enter judgment for the defendant. This case may now be closed.

It is So Ordered.