**Stephen H. OLESKEY, on behalf of Guantanamo internees Lakhdar BOUMEDIENE; Mohamed Nechla; Mustafa Ait Idir; Saber Lahmar; Hadj Boudella; and Belkacem Bensayah**

v.

**UNITED STATES DEPARTMENT OF DEFENSE and United States Department of Justice.**

Civil Action No. 05–10735–RGS.

United States District Court, D. Massachusetts.

Sept. 30, 2009.

Lauren G. Brunswick, Melissa A. Hoffer, Robert C. Kirsch, Lynne C. Soutter, Wilmer Hale LLP, Boston, MA, for Stephen H. Oleskey.

Mark T. Quinlivan, United States Attorney's Office, Boston, MA, for United States Department of Defense and United States Department of Justice.

## MEMORANDUM AND ORDER ON THE MOTION OF THE DEPARTMENT OF DEFENSE FOR SUMMARY JUDGMENT

STEARNS, District Judge.

Plaintiff Stephen Oleskey, a lawyer at the Boston–Washington firm of Wilmer Hale, brought this *pro bono* Freedom of Information Act (FOIA), 5 U.S.C. § 552 *et seq.*, action on behalf of six "enemy combatants" (collectively, detainees) who were or are held as prisoners at the United States Naval Base at Guantanamo Bay, Cuba.[1] The six, all of whom are Algerian-born, had been surrendered by authorities

---

1. Guantanamo Bay is a 45–square–mile enclave on the southeast coast of Cuba. It was ceded to the United States in 1903 by the newly independent Republic of Cuba under a perpetual lease. The enclave has since been used by the United States as a naval base. While the lease specifies that Guantanamo remains under Cuban sovereignty, it grants the United States "complete jurisdiction and control" over Guantanamo Bay. Shortly after the attacks of September 11, 2001, President Bush designated Guantanamo as an internment camp for "illegal enemy combatants" captured in Afghanistan and elsewhere. The administration's choice of Guantanamo as a prison facility appears to have been driven in part by geographical convenience, but more influentially by the desire to hold terror suspects at a place outside the reach and oversight of the U.S. federal courts. *See generally* Jack Goldsmith, *The Terror Presidency: Law and Judgment Inside the Bush Administration*, 107–109 (New York: Norton, 2007). The choice of Guantanamo Bay would have appeared to have a solid legal basis. In *Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), the Supreme Court refused to hear habeas petitions brought by twenty-one German nationals serving sentences for war crimes at the U.S. Army War Criminal Prison at Landsberg, Germany.

of Bosnia Herzegovina to the United States after five of their number were stripped of Bosnian citizenship. The men were alleged to have been affiliated with the al-Qaida terrorist network. They were arrested in October of 2001 at the request of U.S. officials who suspected them of plotting to blow up the U.S. Embassy in Sarajevo. The bomb plot allegation was initially relied on by the government during habeas proceedings, but was subsequently withdrawn.[2] (In January of 2002, the Supreme Court of Bosnia ruled that there was no evidence to support the suggestion of a plot).[3]

> We are cited to no instance where a court, in this country or any other country where the writ is known, has issued [the writ] on behalf of an alien enemy, who, at no relevant time and in no stage of his captivity, has been within its territorial jurisdiction. Nothing in the text of the Constitution extends such a right, nor does anything in our statutes.
>
> *Id.* at 768, 70 S.Ct. 936. However, in *Rasul v. Bush*, 542 U.S. 466, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004), the Court stunned the administration by effectively overruling *Eisentrager*, declaring that Article III courts had statutory jurisdiction to hear habeas claims filed by Guantanamo detainees, and by extension, petitions filed by aliens in U.S. custody anywhere in the world. *See generally* Jane Mayer, *The Dark Side: The Inside Story of How the War on Terror Turned Into a War on American Ideals*, 299–301 (New York: Doubleday, 2008).

**2.** The bomb plot allegation also was cited by President Bush in his 2002 State of the Union Address: "Our soldiers, working with the Bosnian government, seized terrorists who were plotting to bomb our Embassy." President's Address on the State of the Union, 1 Pub. Papers 129, 131 (Jan. 29, 2002).

**3.** In a related lawsuit, Judge Richard Leon of the U.S. District Court for the District of Columbia held hearings on the detainees' petitions for writs of habeas corpus in November of 2008. He granted the writ as to Boumediene, Nechla, Boudella, Ait Idir, and Lahmar, and ordered their release. Bensayah's petition was denied. (The denial is the

Oleskey submitted his original FOIA request on September 24, 2004, to the Department of Defense (DOD) and the Department of Justice (DOJ). Oleskey sought records related to the conditions of confinement and treatment of the detainees at Guantanamo in support of the habeas proceedings brought in the District of Columbia. A pre-litigation agreement with DOD to expedite the processing of the requests proved unsuccessful. As of April 13, 2005, the date this lawsuit was filed, Oleskey had not received a single responsive record from defendants. In the wake of the filing of the Complaint, the

subject of an appeal currently pending before the D.C. Circuit). In granting the writ for five of the detainees, Judge Leon found the government's reliance on a sole, classified intelligence source implicating the detainees in a conspiracy to wage war against U.S. and coalition forces in Afghanistan an inadequate justification for their continued confinement:

> [W]hile the information in the classified intelligence report, relating to the credibility and reliability of the source, was undoubtedly sufficient for the intelligence purposes for which it was prepared, it is *not* sufficient for the purposes for which a habeas court must now evaluate it. To allow enemy combatancy to rest on so *thin* a reed would be inconsistent with this Court's obligation under the Supreme Court's decision in *Hamdi* to protect petitioners from the risk of erroneous detention.

*Boumediene v. Bush*, 579 F.Supp.2d 191, 197 (D.D.C.2008), citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 530, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004). Judge Leon denied Bensayah's petition, finding that the government had adduced sufficient evidence linking him to al-Qaida and a senior al-Qaida operative. *Id.* at 198. Lakhdar Boumediene was the lead plaintiff in *Boumediene v. Bush*, —— U.S. ——, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), which held that the provision of the Military Commissions Act denying federal courts any jurisdiction to hear habeas petitions filed by Guantanamo detainees constituted an unconstitutional suspension of the writ. Oleskey also represented Boumediene (who has since been transferred to France) in the Supreme Court case.

government (DOD and its agencies) produced thousands of pages of records, and identified a large number of others.[4] DOD moved for summary judgment on May 22, 2008, seeking a declaration that it had complied with its obligations under FOIA.[5]

In response to the motion for summary judgment, Oleskey filed a motion to stay and to permit additional discovery pursuant to Fed.R.Civ.P. Rule 56(f).[6] The court allowed the motion, granting Oleskey additional discovery consisting of:

> (i) interrogatories requesting identification of the individuals with knowledge of (a) recordkeeping procedures related to prisoners held at Guantanamo during the period from January of 2002 to the present and (b) details of the search conducted in response to Oleskey's FOIA requests; (ii) depositions of the individuals identified by the DOD in response to these interrogatories; and (iii) production of the standard operating procedure manuals governing recordkeeping at Guantanamo.

Memorandum and Order, Sept. 30, 2008, at 3. On February 6, 2009, Oleskey filed his opposition to the summary judgment motion. The court heard oral argument on April 6, 2009.

## FACTUAL BACKGROUND

The sole issue before the court is the adequacy of DOD's record search in response to Oleskey's FOIA request. In this regard, DOD relies on seven declarations submitted by officials of DOD and its component agencies detailing the compliance efforts.[7] The affidavits are summarized in turn.

### Husta Declaration

Captain Peter A. Husta was serving as Chief of Staff of the Joint Task Force—Guantanamo (JTF–GTMO) in July of 2006 when his affidavit was prepared. In response to Oleskey's FOIA request, from November of 2004 to March of 2005, JTFGTMO identified three Guantanamo components likely to hold responsive records: Joint Detention Group (JDG), Joint Intelligence Group (JIG), and Joint Medical Group (JMG).[8] JDG and JIG each lo-

---

4. DOD's production of documents related to Guantanamo detainees is not limited to this lawsuit. Contemporaneously with Oleskey's filing in Boston, a group of non-profit organizations led by the American Civil Liberties Union (ACLU) filed suit in the Southern District of New York seeking to enforce a separate (and broader) FOIA request pertaining to all detainees. *See American Civil Liberties Union v. Dep't of Defense*, No. 04–CV–4151–AHK (S.D.N.Y. filed June 2, 2004). Pursuant to a March 22, 2005 Order entered by Judge Alvin Hellerstein in that case, DOD was required to produce 8,000 pages of documents every fifteen days.

5. Although DOJ is named as a defendant, there is no allegation that it possesses documents related to Oleskey's requests separate and apart from those generated and maintained by DOD. DOJ appears to have been named in an agency capacity. The parties noted at oral argument that "although the Department of Justice is a defendant in this

case ... this is simply [DOD's] motion for summary judgment regarding the adequacy of the search."

6. Fed.R.Civ.P. 56(f) states that:

> If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order.

7. In response to an Order entered by this court, DOD also produced three high-ranking officials from Guantanamo for depositions. The content of the depositions largely mirrors what is presented more concisely in the relevant affidavits.

8. The proliferation of acronyms is regrettable, but unavoidable in writing on matters involv-

cated responsive documents, while JMG gathered the detainees' medical records.[9] The documents and medical records were provided to DOD's FOIA Office in March of 2005, and forwarded to Oleskey in August of 2005.

A supplementary search was undertaken by JIG, JDG, and Detention Operations (J3) on August 2, 2005, in response to the July 28, 2005 Joint Scheduling Order adopted by this court. JIG stores detainee information in its possession in an electronic database, the Joint Detention Information Management System (JDIMS). By searching JDIMS for the names of the detainees and their Internment Serial Numbers (ISN),[10] JIG located 264 responsive documents. JDG maintains its files in hard copy and in an electronic Detention Information Management System (DIMS). A search of both formats for documents containing the detainees' names turned up 297 responsive documents. J3 files are stored electronically on computer hard drives. Searches of J3 files for information regarding the detainees' transfer from Bosnia Herzegovina to Guantanamo did not locate any responsive records.

*Ethridge Declaration*

Colonel Joe E. Ethridge, Jr., served as Commander of the U.S. Army Criminal Investigative Task Force (CITF) at Fort Belvoir, Virginia, at the time his declaration was made in July of 2006. Ethridge's affidavit provides details of the search of files maintained by CITF. The files, which include the reports of interviews conducted by CITF Special Agents, are maintained in both hard copy and electronic databases. CITF searched its digital files for personal identifiers of the detainees (names, aliases, and ISNs), using I2MS and Orion Magic automated search programs. The hard copy files were manually reviewed by CITF staff. Approximately 1,972 pages of responsive records were located.

*Hoeing Declaration*

Captain Joseph P. Hoeing served as Deputy Director of Intelligence for the U.S. European Command (EUCOM) at the time he made his declaration in July of 2006. Hoeing's affidavit provides details of the search performed at EUCOM's Joint Analysis Center (JAC). Between September of 2005 and March of 2006, JAC personnel spent over 6,800 hours searching and reviewing approximately 9,100 potentially relevant records. This search included records maintained in both physical and electronic formats. For digital files, keyword searches were conducted on classified and unclassified computer systems. Intelligence analysts at the JAC also examined shared network files and stored e-mails. After completing its

---

ing components of the U.S. military, many of which are known (perhaps even to the military itself) only by their short form.

**9.** While all responsive documents located during a FOIA search must be identified, not all need be produced. FOIA contains several exemptions cited by DOD, among them those for properly classified national security and foreign policy information, internal personnel rules and practices of an agency, confidential internal agency documents covered by the deliberative process and attorney-client privilege, and government personnel files the disclosure of which would amount to an invasion of privacy. *See* 5 U.S.C. § 552(b).

When an identified responsive record is withheld because of an exemption, the government must provide a brief description of the withheld record and a detailed explanation of why a particularized exemption applies. The itemized explanation of withheld records is commonly referred to as a "Vaughn" index. *See Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir. 1973).

**10.** ISNs are unique identifying numbers assigned to detainees at Guantanamo for tracking purposes. Boumediene's ISN, for example, was 10005.

search, the JAC forwarded 1,921 files to DOD's General Counsel that were either released to Oleskey or listed in the Vaughn index.

*Taitt Declaration*

John P. Taitt was at the time of his declaration an Associate Deputy General Counsel in the Office of General Counsel (OGC) of DOD. Taitt's affidavit details the searches undertaken at the Office for the Administrative Review of Detained Enemy Combatants (OARDEC), the U.S. Transportation Command (TRANSCOM), and the OGC itself. OARDEC conducted a search of its internal records on or about August 19, 2006, and identified seven responsive documents that had not been previously made public. TRANSCOM's FOIA Office conducted a records search from August 2, 2005 to August 24, 2005, locating fourteen responsive documents. According to Taitt, the U.S. Air Force, pursuant to a long-standing records retention policy, maintains copies of airlift manifests for ninety days, after which they are destroyed. Consequently, TRANSCOM was unable to produce any documents responsive to Oleskey's request.

In September of 2005, OGC staff searched classified and unclassified files kept in both a hard copy and electronic format. The OGC's unclassified e-mail system was searched using key words descriptive of the detainees. A similar search was conducted of OGC's classified e-mail system focused on the e-mail accounts of personnel handling detainee issues. The shared computer drives on both

the classified and unclassified email systems were searched in similar fashion. OGC staff also examined hard copy files in its front office and its International Affairs section. Although responsive documents were identified by OGC, they were claimed to fall under one or more of the FOIA exemptions.

*Kane Declaration* [11]

William J. Kane was, at the time of his declaration, Chief of the Information Management Division, Joint Secretariat, Directorate of Management, of the Joint Staff.[12] Kane's affidavit describes the search effort undertaken at the Joint Staff. Kane's group completed electronic file searches of the Joint Staff archives, the Joint Staff Action Tracking System, and the Joint Staff shared computer drives, using various combinations of dates, names, and keywords. Five responsive documents were located.[13]

*Stimson Declaration*

Charles D. Stimson was the Deputy Assistant Secretary of Defense for Detainee Affairs at the time of his declaration in July of 2006. According to Stimson's affidavit, from October of 2004 (prior to his arrival) through May of 2005, personnel in the Office of Detainee Affairs made a search of internal records, forwarding the results to DOD's FOIA Office in August of 2005. The search included hard copy documents located in file cabinets as well as electronic files maintained on shared computer drives, both classified and unclassified. Electronic search methods focused

---

11. The Kane Declaration appears as Exhibit A following the Taitt Declaration.

12. The "Joint Staff" is a DOD entity composed of approximately equal numbers of officers from the Army, Air Force, Navy, and Marines. Its mission is to assist the Chairman of the Joint Chiefs of Staff in the successful integration of the different branches of the

U.S. military for combat and other purposes, such as the joint operations at Guantanamo.

13. The Taitt Declaration explains that these "five documents" are actually "larger staffing packages containing discrete segregable documents" and should thus be counted as thirty-two responsive documents. Taitt Declaration, at 12 n. 28.

on key words, including the name and ISN for each detainee. Fifteen responsive documents were identified.

*Martin Declaration*

Commander Don A. Martin was the Staff Judge Advocate (SJA) at JTF–GTMO at the time of his declaration in May of 2009. Martin's affidavit supplemented the declaration provided by Captain Husta by describing the search of the records maintained at JTFGTMO by its SJA and Inspector General (IG). An initial search was conducted in 2005 by Commander Martin's staff, the results of which were verified by a second search conducted on April 29, 2009. Electronic files and hard copy files were searched by SJA staff using the detainees' names and ISNs. From this search, SJA staff identified two responsive documents consisting of a total of nine pages. The IG, who had not been named in any previous request by Oleskey, conducted a staff search of his electronically-maintained files on April 30, 2009. The search found no documents that were responsive to Oleskey's request.

## DISCUSSION

The standard applied in a FOIA summary judgment action is derived from Fed. R.Civ.P. 56.

It is well settled in Freedom of Information Act cases as in any others that summary judgment may be granted only if the moving party proves that no substantial and material facts are in dispute and that he is entitled to judgment as a matter of law. It is equally settled in federal procedural law that the party seeking summary judgment has the burden of showing there is no genuine issue of material fact, even on issues where the other party would have the burden of proof at trial, and even if the opponent presents no conflicting evidentiary matter. The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.

*Founding Church of Scientology of Washington, D.C., Inc. v. Nat'l Sec. Agency,* 610 F.2d 824, 836 (D.C.Cir.1979) (internal quotations omitted).

 In a summary judgment context, the burden rests with the agency subject to a FOIA request to establish that it has "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army,* 920 F.2d 57, 68 (D.C.Cir.1990). "The crucial issue is not whether relevant documents might exist, but whether the agency's search was reasonably calculated to discover the requested documents." *Maynard v. Cent. Intelligence Agency,* 986 F.2d 547, 559 (1 st Cir.1993) (internal quotations omitted). FOIA "was not designed to supplement the rules of civil discovery, and [a requester's] right to obtain information is neither enhanced nor diminished because of its needs as a litigant." *Deering Milliken, Inc. v. Irving,* 548 F.2d 1131, 1134–1135 (4th Cir.1977).

 To demonstrate FOIA compliance, the government "may rely upon affidavits provided they are relatively detailed and nonconclusory, and are submitted by responsible agency officials in good faith." *Maynard,* 986 F.2d at 559. Sufficient details in government affidavits may include "setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched." *Iturralde v. Comptroller of Currency,* 315 F.3d 311, 313–314 (D.C.Cir.2003) (citation omitted). Once such affidavits are produced, the government is afforded a presumption of good faith and the burden shifts to the reques-

ter to "provide countervailing evidence as to the adequacy of the agency's search. If a review of the record raises substantial doubt, particularly in view of well defined requests and positive indications of overlooked materials, summary judgment is inappropriate." *Id.* (citations omitted).

■ DOD argues that the declarations establish that it engaged in a "good faith effort," thereby entitling it to summary judgment regarding the adequacy of its search. *See Oglesby,* 920 F.2d at 68. The court finds that the seven affidavits adequately "describe, in a detailed and nonconclusory fashion, the structure of the agency's file system, the scope of the search performed, and the method by which it was conducted." *Sephton v. Fed. Bureau of Investigation,* 365 F.Supp.2d 91, 97 (D.Mass.2005), *aff'd,* 442 F.3d 27 (1st Cir.2006).

In the aggregate, the seven affidavits present a comprehensive picture of the relevant system of records located within DOD. Because they describe with specificity the scope of the search and the methodology employed in responding to Oleskey's requests, they are "afforded the presumption that they have been offered in good faith." *Id.* at 100, citing *Maynard,* 986 F.2d at 560. "In light of this showing, the plaintiff must rebut the good faith presumption generated by the agency's affidavits with more than 'pure speculation

about the existence and discoverability of other documents.'" *Id.,* quoting *Maynard,* 986 F.2d at 559.

Although Oleskey relies on "newly obtained" evidence in his Opposition, he puts forward no new arguments beyond the generic assertion that the government could have done more. Oleskey, however, fails to specify in a concrete fashion any omitted or overlooked avenues of search. At oral argument, Oleskey suggested that DOD might undertake searches of the records of the IG or SJA regarding alleged detainee abuse, videos in possession of the J3 group (which mans the "combat camera"), records of forced cell extractions, and records related to the visit to Guantanamo of an official representative of Bosnia Herzegovina.[14] Even assuming *arguendo* that there is a patch of ground left untilled by DOD's search efforts, the court has been given no plausible explanation as to why or how records regarding forced cell extractions (if they exist) or the visit of a Bosnian representative to Guantanamo would have any conceivable relevance to a writ of habeas corpus. The writ provides for release from unlawful confinement; it does not address lawful confinement under conditions thought unduly harsh.[15]

Oleskey principally counters by hypothesizing about the possible existence of DOD records that might have been created and retained.[16] DOD argues that Oleskey mis-

---

14. Oleskey refers to a visit on July 27–28, 2004 by Amir Pilav, Assistant Minister of Justice, Ministry of Foreign Affairs of Bosnia, to the Guantanamo prison. While at Guantanamo, Pilav allegedly interviewed four of the requesters. Oleskey cites documents released by DOD pursuant to his FOIA request that reference video and audio recordings made by DOD of these interviews. DOD responds that it "has repeatedly informed plaintiff that it has [no] record of this visit or any interview by Mr. Pilav."

15. The latter is addressed not by habeas corpus, but by an action brought under section 1983 of the Federal Civil Rights Act (42 U.S.C. § 1983). Relief under section 1983 is comprised of compensatory damages and equitable amelioration of a petitioner's unconstitutional conditions of confinement. The relief, however, does not include a remission of one's sentence (or detention as an enemy combatant).

16. Oleskey did suggest, based on the depositions resulting from this court's previous Order, that the SJA and IG at JTF–GTMO might

understands the legal standard for a FOIA search and what was required of the government. I believe that the central thrust of DOD's argument is correct. FOIA was not intended as an invitation to a snipe hunt. A FOIA search need not proceed with the avidity of a miller's quest for grist; it need only be properly motivated, sufficiently energetic, and reasonably designed to uncover the information requested. *See Oglesby,* 920 F.2d at 68.

Oleskey first challenges the adequacy of DOD's searches on grounds that the searches "were not adequately designed to overcome the obstacles presented by recordkeeping at Guantanamo." According to Oleskey, "disorganization and lack of an established procedure characterized recordkeeping at Guantanamo." While Oleskey's FOIA requests were pending, Guantanamo recordkeeping switched—as did most government agencies—from a paper-based to an electronic-based storage system.[17] Oleskey contends that frequent changes in location of both staff and docu-

ments, along with staff turnover, "contributed to the need for particular care in searching for documents at Guantanamo." Oleskey further argues that the searches could not have been adequate because the persons who searched for records in response to his requests were not "trained FOIA professionals."[18] Oleskey asserts that DOD undertook merely a "run of the mill" FOIA search, which was inadequate as a matter of law because it was limited to "readily accessible" files and could not have recovered relevant documents in light of the "disorganized nature of and lack of procedures for recordkeeping at Guantanamo."[19] Oleskey asserts that

the fact that Detainee Operations—the agency in charge of the movement of detainees to and from Guantanamo—did not uncover a single responsive document in its search is, *res ipsa,* evidence of the inadequacy of the search and renders absurd the Government's claim that it conducted a "thorough review of its files and databases for '[r]ecords con-

hold additional responsive records. DOD sufficiently addressed this concern in the Martin Declaration.

17. It is not clear whether Oleskey's complaint is that the switch to an electronic database made searches more difficult and less comprehensive than manual searches of paper records (which seems improbable), or that some paper records may not have been copied into the new system (which would seem probable). This latter concern, however, is addressed by the dual-path searches conducted by the relevant agencies of both their paper and electronic databases.

18. This suggestion might not sit well with the associates in Oleskey's practice who (by all appearances) quite capably ferreted out the appropriate questions and avenues of search to be followed (particularly in the context of the Rule 56(f) motion) despite their lack of certification as "trained FOIA professionals."

19. Oleskey goes on to state: "As a result, unsurprisingly—and virtually without exception—the agencies with the most responsibili-

ty with respect to Guantanamo operations (i.e., those with the most relevant documents), conducted the least fruitful searches. For instance, while the U.S. European Command, an agency based far from Guantanamo and with only limited involvement with Requesters, found 1,921 responsive documents, agencies like Detainee Operations, the Office of Detainee Affairs and the Joint Staff—agencies that directly oversee the collection of information at the base and have done so on a daily basis for more than seven years—located a paltry 0, 15 and 32 responsive documents, respectively." A "run of the mill" search is a colloquialism and not a legal term of art. As I understand the expression, a "run of the mill" search would seem to be what FOIA requires, although I do not imply that the search conducted here was merely average. While it took some prodding by Oleskey and the court, the search here, as best the court can gauge, was conducted with commendable thoroughness.

cerning the transport of Requesters from Bosnia and Herzegovina to [Guantanamo].'"

What Oleskey fails to identify are the additional files that JTF–GTMO should have searched in response to his request. DOD's affidavits consistently demonstrate that all places where responsive records could be expected to be found were in fact searched. The Husta Declaration states that all information in the possession of JIG and JDG regarding a particular detainee was located in either the JDIMS or DIMS system respectively, both of which were in fact searched. Husta Declaration, at ¶¶ 7 and 9. Captain Husta also explained that any existing and retained files regarding the transportation of requesters to Guantanamo would have been in the J3 Excel spreadsheet or computer drive folders that were searched.[20] *Id.* at ¶ 11. Any hard copy files not yet scanned would also have been searched as a matter of standard procedure. *See* Hadjis Deposition, at 103–104.

The court finds little merit in Oleskey's criticism regarding the volume of the various records produced by DOD components. The court need not engage in speculation about which components of DOD should have produced greater or lesser numbers of documents. The court accepts, as it must, that DOD's affidavits are presented in good faith and that the total number of documents identified reflects the actual number of records located during the searches of each of the DOD components. *See Iturralde,* 315 F.3d at 314–315.

Oleskey's criticisms of supposed disorganization at Guantanamo also have no bearing on the legal sufficiency of the searches and their results. Under FOIA, an agency must respond to an information request by completing a reasonable search of those places where responsive records are likely to be found. *Oglesby,* 920 F.2d at 68. FOIA contains no requirement that the government maintain its files in a particular way so as to facilitate such a search.

Oleskey's second overarching criticism of the adequacy of DOD's search is the suggestion that specific responsive documents exist that were not located by DOD. Citing *Founding Church of Scientology,* 610 F.2d at 837, Oleskey claims to have identified "numerous 'positive indications of overlooked' documents." He primarily relies on theories of how records were ordinarily supposed to be generated, and the subsequent failure of DOD to produce these records.[21] Oleskey cites as examples: DOD produced only five standard operating procedures (SOP)—four of which were related to FOIA searches despite this court's Order to produce SOPs related to recordkeeping; DOD began to produce the detainees' medical records only after Oleskey noted their absence from DOD's productions; DOD failed to produce daily activity logs, which would have been required by the SOPs, containing information related to communication among detainees, detainees' movements, and detention locations; no personal files related to any of the requesters were produced;[22] DOD failed to produce any video

---

20. The court notes that the lack of any files concerning the transportation of requesters is consistent with the Air Force records retention policy described in the Taitt Declaration.

21. Oleskey's opposition also makes reference to DOD's failure to produce Federal Bureau of Investigation (FBI) and Department of

State records. Because any such records lie with different government agencies, they are irrelevant to the adequacy of DOD's search.

22. Oleskey argues that "the fact that no photographs of Requesters were produced suggests that some or all of these files were overlooked." However, DOD explains that

or audio recordings that Oleskey believes to exist, as certain events, including interviews, disciplinary incidents, and shaving of beards, are required to be recorded and written logs must be maintained;[23] no records of diplomatic visits with the detainees were produced; and, DOD has not produced any interview or interrogation reports, which would have been created in the ordinary course of detention.

■ The court need not address each of these arguments individually because they all suffer from the same flaw in attempting to place unrealistic expectations upon DOD. "Perfection is not the standard by which the reasonableness of a FOIA search is measured." *Judicial Watch v. Rossotti*, 285 F.Supp.2d 17, 26 (D.D.C. 2003). Oleskey maintains that other files must exist, but fails to explain why the declarations by knowledgeable DOD officials that their search efforts were exhaustive are misleading or incorrect. In making this argument, Oleskey focuses wrongly on the results of the search rather than on the search itself. *See, e.g., Hornbostel v. U.S. Dep't of the Interior*, 305 F.Supp.2d 21, 28 (D.D.C.2003) ("[T]he focus of the adequacy inquiry is not on the results."), aff'd, 2004 WL 1900562, at *1 (D.C.Cir. Aug.25, 2004).

In bureaucracies as large as DOD, it is inevitable that some files will be misplaced, lost, not retained, or, in some cases, never created at all. *See Maynard*, 986 F.2d at 564 ("[T]he fact that a document once existed does not mean that it now exists; nor does the fact that an agency created a document necessarily imply that the agency has retained it.") (citation omitted). This may happen because of agency policies or in spite of them. Even if Oleskey's theories are correct that additional responsive records may have once existed, DOD's failure to locate them does not *ipso facto* render its search inadequate. *See Nation Magazine, Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 892 n. 7 (D.C.Cir.1995) ("[T]he failure to turn up [a particular requested] document does not alone render the search inadequate; there is no requirement that an agency produce *all* responsive documents.").

The amount of effort behind DOD's search cannot be understated. This court previously recognized that DOD has "undertaken a 'massive' search of voluminous records that has consumed hundreds, if not thousands, of person-hours." Memorandum and Order, Sept. 30, 2008, at 2. The latter estimate has proven closer to the final total, as DOD informs the court that this search effort has consumed over 11,800 hours of staff time. As DOD points out, based on a forty-hour work week, this represents almost six years of staff work. The search spanned six months, involving numerous personnel in Virginia, Florida, Cuba, and Europe, and resulted in the production or identification, by means of the Vaughn index, of over 10,000 responsive records. According to DOD, the effort undertaken in response to Oleskey's FOIA request was "virtually unprecedented." The court has been given no persuasive reason to doubt this assertion.

What FOIA was intended to provide was an increased openness between the government and its citizens by requiring the production of requested non-exempt records located by a good faith search conducted by the agency that possesses them. The intent of the statute was met in this

---

the photographs were included in the Vaughn index as exempt from production as classified.

23. The government acknowledges the existence of one specific video of Ait Idir, but states that it was misplaced.

case. Consequently, the motion for summary judgment will be *ALLOWED*.

### *ORDER*

For the foregoing reasons, the motion of the Department of Defense for summary judgment is *ALLOWED*.

SO ORDERED.